SMITH V. DEAN

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-042-CV

DAVID W. SMITH, D.D.S. AND APPELLANTS

WIFE, CATHY C. SMITH

V.

WILLIAM DEAN, M.D. AND CARDIOVASCULAR APPELLEES

AND THORACIC SURGICAL GROUP OF WICHITA

FALLS, P.A., D/B/A CARDIOVASCULAR AND 

THORACIC SURGICAL GROUP OF WICHITA FALLS

------------

FROM THE 78TH DISTRICT COURT OF WICHITA COUNTY

------------

OPINION

------------

I.  Introduction

In this medical malpractice case, appellants Dr. David and Mrs. Cathy Smith appeal the jury’s verdict and trial court’s judgment for appellees Dr. William Dean and the Cardiovascular and Thoracic Surgical Group of Wichita Falls, P.A., d/b/a Cardiovascular and Thoracic Surgical Group of Wichita Falls.  In three related issues, appellants argue that several venire members were
 
biased as a matter of law, that those venire members were not rehabilitated, and that the trial court abused its discretion in denying appellants’ challenges for cause to those individuals.  We affirm.

II.  Background Facts

On January 31, 2002, Dr. Smith, a dentist, underwent aortic valve replacement surgery to correct a blood flow problem that Dr. Dean had helped diagnose.  During the surgery, which was performed by Dr. Dean and Dr. Olyn M. Walker, Dr. Smith suffered an injury due to inadequate blood flow. Consequently, Dr. Smith required a heart transplant, which he received eight days later.  Because of these injuries, appellants filed a medical malpractice suit against appellees alleging direct and vicarious health care liability claims.

A.  Questions Concerning Burden of Proof During Voir Dire

At voir dire, appellants’ trial counsel questioned several of the venire members about their feelings regarding medical malpractice claims and the  burden of proof required to find economic damages:

MR. BRILEY: . . . .  I want to switch gears a little bit and talk to you about some things that come up in these types of lawsuits.  We are seeking money damages for the destruction of David Smith’s heart.  And the Judge will tell you later, the 12 that are on the panel, that the burden of proof that I have to convince you that the doctor made a mistake that’s legally correctible [sic] by ordering him to pay money, is that he must do something below the standard of care.  That is, he must do something that an ordinary prudent physician in that field either would or wouldn’t have done, okay.

And that I must prove that with a level of what’s called a preponderance of the evidence, that is, the greater weight and degree of credible evidence, okay?  

In Texas we would say that’s crossing the 50 yard line.  The greater weight would be crossing the 50 yard line.  Don’t have to score a touchdown, that might be in a criminal case, but you’ve got to be more likely than not.

Does anyone here feel that that standard, more likely than not, is too low if you’re suing a doctor, that it ought to be like to the 80 yard line or 90 yard line?  It’s got to be more than more likely than not?  Anyone feel that way?

Yes, sir.

VENIREPERSON GRIEB:  Are you—are you saying by your question, are you—let me rephrase your question to see if I understand it.  What you’re driving at, are you saying doctors should be held to a higher standard?

MR. BRILEY:  No.

VENIREPERSON GRIEB:  You’re not saying that?

MR. BRILEY:  No.  I’m asking you if you’re going to hold me to a higher standard because I’m suing a doctor?

VENIREPERSON GRIEB:  So you’re trying to put yourself on the same plateau as the doctor?

MR. BRILEY:  The Judge is going to tell you that the burden of proof in this case is that the Plaintiff must prove whatever they’re saying, that the doctors fell below the standard of care on the basis, on a standard, a yard stick called preponderance of the evidence, that is more likely than not.

It’s not like in a criminal case beyond all doubt, beyond a shadow of a doubt, beyond a reasonable doubt.  It’s more likely than not.

And what I’m asking is that because we’re suing physicians, does someone say, if I’m going to hold a doctor responsible, it has to be higher than more likely than not?  Anyone feel that way?

Yes, sir.

VENIREPERSON HUFFSTUFLER:  Brady Huffstufler.

MR. BRILEY:  Mr.  Huffstufler.

VENIREPERSON HUFFSTUFLER:  I don’t know what kind of money we’re talking about or what, it needs to be more than 50 percent sure if we’re going to make him pay—I’m sure it’s a substantial amount of money, I don’t know, but if you’re going to make him pay that, I’d like to think that if I was sitting up there, that the jury was more than 50 percent sure that I messed up before they’re going to make me pay.

MR. BRILEY:  Okay.  Let me get this straight.  You think that it ought to be more than 50 percent.  Do you think it ought to be more than some higher number?

VENIREPERSON HUFFSTUFLER:  I would think in order for us to find him—to pay him money, we would need to be 100 percent sure that he made a mistake.  Because if we’re not, who says he is liable for whatever happened?

MR. BRILEY:  Who agrees with Mr.  Huffstufler, that its got to be 100 percent? Keep your hands up please.  

Twenty-nine venire members raised their hands in response.
(footnote: 1)

MR. BRILEY: . . . .  All the folks that just raised your hand, as far as you’re concerned, even if the Judge says, Mr. Briley only has to prove his case by a greater weight and degree of credible evidence, is it true that all of ya’ll say, I can’t do that.  No matter what the Court tells me, I have to have more than 51 percent.  Is there anybody that disagrees with that statement?

Counsel for appellees objected to the form of the question and to Mr. Briley’s definition of the burden of proof.  After the trial court sustained the objection, Mr. Briley attempted to clarify the response by asking the following question:

For the folks that raised their hand that I called off the number, my question is this: Even if the Judge instructs you that the standard that I have to prove the case is a preponderance of the evidence, that is the greater weight and degree of credible evidence, 51 percent, are all of the folks that raised their hands, is your attitude that you cannot follow the Court’s instructions because you need more than 51 percent to prove a breach of the standard of care in a medical negligence case?  

Is there anyone that disagrees with that?

None of the venire members raised their hands or otherwise indicated their agreement or disagreement with the question.

Appellant next questioned the venire members regarding the burden of proof required for noneconomic damages:

MR. BRILEY:  I want to switch gears a little bit more, and Mr.  Huffstufler, I think, zeroed in on this.  Some folks may say, you know, It’s okay, I feel comfortable with this burden of proof at this greater weight and degree thing, this 51 percent thing if we’re talking about reimbursment of, say, medical expenses, something that you’ve lost.

How many here on the panel feel that I would have to prove the case beyond the preponderance if we’re seeking damages like pain and suffering or non-economic damages?  Is there anyone that feels that way?

Mr.  Huffstufler, how do you feel if I’m seeking a million dollars or whatever the number is for non-economic damages?  What level of proof would you hold me to?

VENIREPERSON HUFFSTUFLER: I wouldn’t feel comfortable making him pay anything unless I was 100 percent sure that he should, that it was his fault, whatever happened.  And like I say, I’m going to be 100 percent sure.  Who am I to make him pay for something that I’m not completely certain that he owes him that?

Mr. Briley then asked a final question, which regarded damages in general:

Okay, Now I apologize if I have to go through this one by one, but who of you—if you’ll raise your hands—agree with Mr.  Huffstufler?  That is, that you feel you cannot award money for any damages unless you’re 100 percent certain that the doctor made the mistake?  Raise your hands, please?

Thirty-three venire members responded affirmatively to this question.
(footnote: 2)  These venire members represent the “block group” that the trial court referred to throughout the hearing on challenges for cause.

Mr. Briley then addressed the instruction that all jurors set aside bias, sympathy, and prejudice in deciding the facts of the case:

Okay, there’s another instruction that the Court is going to give you.  In fact, it usually is the first instruction, and that says that you cannot use bias, sympathy or prejudice in deliberating if you’re on the jury; bias, sympathy and prejudice.

So, for example, if someone were sympathetic to David Smith and his wife, you couldn’t use that sympathy to find something in the case.  Or by the same token, if you were sympathetic to one of the physicians, you’d have to set that aside.

Is there anyone here who feels like, I just can’t do that?  Even if the Court tells me I have to do that I just can’t set that aside?

None of the venire members responded to this question, and Mr. Briley 

continued his questioning.

We had a lot of people that said, like Mr. Huffstufler, that you have to be absolutely sure before you can award any damages.  What I want to find out is if there’s somebody here who’s not quite as strong as Mr. Huffstufler, who says, I can award some damages but there are other types of damages that I can’t award unless you prove by an absolute certainty or 100 percent that the doctor did something wrong?  Okay, are you with me?

And I understand Mr. Huffstufler’s position, but is there someone who says, Well, I can award economic damages loss of wages or medical expenses on this preponderance standard, but when you want something for like non-economic damages, that you have to show me more?  Is there anyone who feels that way?

VENIREPERSON RAYMOND SMITH: Yes.

MR. BRILEY: Mr.  Smith.  How do you feel about it?

VENIREPERSON RAYMOND SMITH: Well, I’m stronger than a preponderance of the evidence but not beyond a shadow of a doubt type situation.  I’d have to have some kind of gross negligence or something like that.

MR. BRILEY: Okay.  So in order for me to get you to award non-economic damages, pain and suffering for example, it would have to be more than a preponderance of the evidence.  Is that correct?

VENIREPERSON RAYMOND SMITH: Yes, sir.

Mr. Briley asked the panel who agreed with Venireperson Smith.  The only venire member who responded affirmatively and who ended up being seated on the jury was Sherry Baker (#26).

B.  Rehabilitation of Jurors

Mr. Chamblee, counsel for Dr. Sudarshan,
(footnote: 3) explained to the venire members the importance of following the trial court’s instructions in applying the correct burden of proof.  Mr. Chamblee explained that the trial court would define “preponderance of the evidence” and then addressed the panel’s previous responses to Mr. Briley’s questions: 

Now here’s the question.  Some of y’all raised your hand in response to questions saying, for instance, you raised your hand and said, Oh, I just personally believe I need to be certain.  I need 100 percent.  And It’s okay to think, you know, just personally, I just would like to see and have more. 

The question is more detailed than that, and that is this: Regardless of your personal belief or what you might like the law to be or what you might like to see, will you abide by or disregard the Court’s instructions?

Do you understand the question I’m now asking you?

First row, do y’all understand the question?

Second row, do you understand the question I’m asking you?  Third 

row? Fourth row?  Fifth row?

Here’s my question.  A bunch of you raised your hand in response to questions asked by Mr.  Briley, said 100 percent.  If you want to find someone at fault, 100 percent.  I‘m discussing with you if the Court instructs you, you are to be guided by the preponderance of the evidence in finding yes to any question asked, and preponderance of the evidence is greater weight and degree of credible evidence, and he instructs you to follow it, is there anybody here who needs to raise their hand and tell me, I will, because of my personal opinions, my personal beliefs, I will disregard what the Court is instructing me to do?  I won’t follow it, I’ll do my own thing?

Is there anybody here who says and needs to raise their hand to say, that’s what I’m going to do? 

Venireperson Grieb asked for clarification about whether refusal to follow the instructions constituted a crime.  The trial court responded as follows:

Let me help answer that just a moment, if I could.  The answer to that is no, and the purpose of this proceeding and this part of the proceeding or voir dire is to really find out if you can or cannot follow that kind of instruction, and it’s okay again if you can’t.

If you say, My [sic] personal conviction is such that even if the Judge tells me to do one thing, my personal conviction is that I can’t do that, then that’s the purpose of this part of the trial is to say, I really can’t do that.

And I think that’s supposed to be the purpose that we’re all trying to get to is to find out if you have such a strong held conviction that if I give you an instruction on a certain thing whether it’s burden of proof, whether it’s the law in some other area, whether or not you can follow that instruction.

But if you have personal convictions that say, I just can’t follow that instruction, then nothing is going to happen to you.  It’s just that this is the time to let everybody know that so what we’ll be able to find out about that. Does that help?

VENIREPERSON GRIEB: That helps, yes, sir.

Mr. Chamblee then questioned the panel on whether they could follow the trial court’s instructions on the burden of proof: 

All right.  Now, with that being said, I’m going to go row by row real quick so I understand.  In other words, the Judge will give you the instruction.  It’s okay to have a personal feeling, but he’s going to tell you in our judicial system, this is what shall guide you in this case.

The question is if you have some personal belief, can you set it aside and follow his instruction with regard to preponderance of the evidence?

By raising their hands, seven venire members indicated that they would disregard the trial court’s instructions and require a heightened burden of proof.
(footnote: 4)
C.  Appellants’ Challenges for Cause

The trial court next conducted a hearing on challenges for cause outside the presence of the jury.  Appellants first challenged the seven venire members who said they could not follow the trial court’s instructions on the burden of proof even after the trial court and Mr. Chamblee clarified the process.  The trial court 
granted 
these challenges.  The trial court also 
granted 
appellants’ challenge to Venireperson Huffstufler, who was the first from the “block group” to say that he would require 100 percent certainty before making appellees pay any type of damages.  The trial court then addressed appellants’ challenges for cause to those venire members in the “block group” who raised their hands in agreement with Venireperson Huffstufler.

Well, part of the problem I have with the way you did it was, it was a little fuzzy because one person says—and the person that started it, I granted the challenge to.  But then all of a sudden, one person says it and it’s, Me too, Me too, Me too, and you’ve got half the room that raises their hand.

The trial court further stated that at least one of the questions was not predicated on whether or not the jurors could follow the court’s instructions on the burden of proof.  The trial court also expressed concern that the proper definition for “preponderance of the evidence” was not given and gave his opinion on the overall questioning.

I think—the problem I have, I think mass hysteria took over when that one guy stood up and started talking, and that’s what I’m having a problem with.

The trial court stated that Mr. Chamblee had rehabilitated the “block group” when he explained the burden of proof and the importance of following the trial court’s instructions.  The trial court next noted that appellate courts have accepted rehabilitation and offered to bring in any of the complained-of jurors for the appellants to examine; appellants declined this opportunity.  Subsequently, the trial court held that the “block group” was rehabilitated with the exception of the seven venire members who had already been stricken for cause.  
See
 
supra
 note 4.

D. Peremptory Challenges

The trial court next heard the parties’ peremptory challenges.  Appellants complained that they would have insufficient peremptory challenges because the trial court would not grant challenges for cause for twelve venire members from the “block group”:  Frank Holt (#1), Brandy Rhoades (#3), Daniel Polk (#4), Susan Stratton (#14), Jodi Camp (#24), Sherry Baker (#26), Sally Brann (#29), Sarah Arredondo (#31), Mary Bentley (#32), Joanne Berend (#33), Victoria Hagins (#35), and Frank Keith (#36).  After providing this list to the trial court, appellants asked for five additional peremptory challenges.  The trial court denied this request.

Appellants used peremptory strikes on venire members 19 and 20, but did not use any of their remaining peremptory strikes on the venire members from the “block group” identified as having survived their challenges for cause.  Eight of the venire members who were part of the “block group” that appellant challenged for cause ended up on the jury.
(footnote: 5)  The jury returned a verdict for appellees.  

III.  Appellants’ Three Issues

Appellants first complain that the trial court abused its discretion by not granting their challenges for cause for the venire members in the “block group” because those individuals were biased as a matter of law.  Alternatively, appellants argue that the trial court abused its discretion by ruling that the venire members had been rehabilitated.  In their third issue, appellants argue that regardless of the outcome of the first two issues, the trial court erred by denying their challenges for cause.  Because these issues are related, we address them together.

A.  Standard of Review and Applicable Law

Voir dire examination is largely within the sound discretion of the trial court, and broad latitude is allowed for examination.  
Cortez v. HCCI-San Antonio, Inc
., 159 S.W.3d 87, 93 (Tex. 2005).  However, Texas law disqualifies venire members who are unequivocally biased or prejudiced.  
Tex. Gov’t Code Ann.
 § 62.105(4) (Vernon 2005).  The Texas Supreme Court defines bias as an inclination toward one side of an issue rather than to the other. 
 Hyundai Motor Co. v. Vasquez
, 189 S.W.3d 743, 751 (Tex. 2006)
.  Prejudice is prejudgment, which necessarily includes bias. 
 Id. 
 The bias or prejudice applies not only to parties but also to certain types of cases. 
 Id.
  A venire member who is unequivocally biased or prejudiced is disqualified to serve as a juror, and the venire member cannot revive his eligibility by recanting an earlier expression of bias or prejudice. 
 Shepherd v. Ledford
, 926 S.W.2d 405, 411 (Tex. App.—Fort Worth 1996), 
aff’d,
 962 S.W.2d 28 (Tex. 1998).  Whether a juror is biased or prejudiced may be a factual determination for the trial court to decide.  
Hyundai Motor Co.
, 189 S.W.3d at 755. 

Rehabilitation of a venire member involves further questioning of a venire member who expressed an 
equivocal 
bias as opposed to an 
unequivocal 
bias.  
Cortez
, 159 S.W.3d at 92.  Rehabilitation is allowed because biased responses may be the result of inappropriate leading questions, confusion, misunderstanding, ignorance of the law, or merely loose words spoken in warm debate. 
 See id.
  If a venire member expresses equivocal bias, further questioning should be allowed to reinforce the biased statement or rehabilitate the venire member. 
 Id. 
at 93.

If a venire member unequivocally expresses bias, the venire member is disqualified as a matter of law, and the trial court has no discretion to decide whether to strike the venire member.  
See Malone v. Foster
, 977 S.W.2d 562, 564 (Tex. 1998).  However, trial courts exercise discretion in deciding whether to strike venire members for cause when bias or prejudice is not established as a matter of law, and there is error only if that discretion is abused.  
Cortez
, 159 S.W.3d at 93.  A trial court does not abuse its discretion by refusing to strike a juror who expresses bias when the juror equivocates or is “rehabilitated.”  
Id
.  In reviewing such decisions, we must consider the entire examination, not just answers that favor one litigant or the other.  
Id. 
 

B.  Preservation of Error

To preserve the erroneous denial of a for-cause challenge, a party must use a peremptory challenge on the venire member at issue, exhaust all of its remaining peremptory challenges, and notify the trial court that additional objectionable jurors will remain on the panel.  
Id.
 at 91.  The purpose of the preservation rule is to allow the trial court to review its ruling before the jury is empaneled and decide if the party was forced to take objectionable jurors.  
See id.
; 
see also McMillin v. State Farm Lloyds
, 180 S.W.3d 183, 194 (Tex. App.—Austin 2005, pet. denied) (holding that a party preserved error where they notified the court that they had fewer peremptory strikes than the number of venire members they had challenged for cause, and thus objectionable jurors would remain unless the court granted more peremptory challenges).

C.  Application and Analysis 

Appellees claim that appellants did not properly preserve the jury selection error.  We agree in part.  Appellants started with six peremptory challenges.  When the trial court refused to strike twelve venire members from the “block group,” appellants stated that they would not have enough peremptory challenges and requested five more.  The trial court denied this request.  Eight of the twelve challenged venire members made it onto the jury panel.  Appellants used two peremptory challenges on venire members 19 and 20, individuals that they had previously challenged for cause unsuccessfully.  Because appellants did not use their remaining four peremptory challenges on the complained-of jurors from the “block group,” they waived their objection to these four jurors.  
See Cortez
, 159 S.W.3d at 90; 
see also McMillin
, 180 S.W.3d at 194 (holding that appellants waived error for as many objectionable jurors as they did not strike with peremptory challenges).  

However, appellants preserved error as to the remaining four jurors because, even if they had used all of their peremptory challenges to strike the complained-of jurors, 
four 
objectionable jurors still would have remained on the panel.  
See Cortez
, 159 S.W.3d at 90; 
see also McMillin
, 180 S.W.3d at 194-95 (explaining that appellants must show the trial court committed error as to one more juror than the appellants preserved error for in order to show harm).

After appellants explained the law to the venire members, several of the them indicated they would want higher than 51 percent certainty that Dr. Dean made a mistake before they would make him pay.  However, appellants’ trial counsel asked this question regarding the burden of proof in a confusing manner.  He first asked, “[I]s your attitude that you cannot follow the Court’s instructions because you need more than 51 percent to prove a breach of the standard of care in a medical negligence case?”  Then, without allowing any venireperson to respond, he asked, “Is there anyone that disagrees with that?” 

If trial counsel paused between these questions and none of the venire members to whom he directed the first question responded, then their silence could have meant they could follow the trial court’s instructions on the  preponderance of the evidence burden of proof.  However, because appellants’ counsel did not pause between the two questions, then his use of the words “cannot” and “disagree” in the two questions, respectively, rendered his query not only a compound question, but confusing due to the double negative.  Some of the venire members from the block group may have been nonresponsive to the first question, some the second, and some nonresponsive due to confusion, 
i.e.
, concerning where to indicate disagreement.  
See Cortez
, 159 S.W.3d at 92 (stating that jurors could not be disqualified as a result of leading questions, confusion, or misunderstanding).  Therefore, it was likely that the trial court did not disqualify those jurors because their answers could have been the result of confusion.  
See id.

Furthermore, the venire members from the “block group” did not express unequivocal bias by merely raising their hands. 
See Sosa v. Cardenas
, 20 S.W.3d 8, 12 (Tex. App.—San Antonio 2000, no pet.) (holding that venire members who raised their hands in response to a question could not be disqualified as a matter of law).  They could have raised their hands in response to trial counsel’s question about whether they agreed with another venire member.  
See id. 
(holding that several jurors who merely raised their hands in response to a question propounded to the entire panel were not disqualified). Further, Sherry Baker (#26) was the only seated juror that raised a hand when Mr. Briley asked who agreed with Venireperson Smith, and would require more than preponderance of evidence to award noneconomic damages.  By themselves, these responses, or lack of responses, are not enough to establish bias as a matter of law.  
See id
.  Because the jurors were not biased as a matter of law, the trial court had discretion to decide whether to strike them for cause or to temporarily retain them on the panel for rehabilitation.  
Cortez
, 159 S.W.3d at 93.

Although the jurors from the “block group” expressed some bias during voir dire, by the end of the questioning, they were rehabilitated.  Mr. Chamblee and the trial court spent time explaining the law and the burden of proof to the panel.  After his explanation, Mr. Chamblee asked each row if they understood the law and then asked if they could follow it and the trial court’s instructions. None of the jurors from the “block group” who were ultimately empaneled raised their hands or otherwise indicated that they could not follow the instructions or the law.  This further questioning and explanation allowed the jurors empaneled from the “block group” to show that they had been successfully rehabilitated.  
See id.

Appellants argue that 
Shepherd 
is controlling in this case because Mr. Chamblee attempted to rehabilitate through silence.  
Shepherd
, 926 S.W.2d at 412 (holding that jury member who expressed bias in questioning could not be rehabilitated through silence).  We disagree.  In 
Shepherd
, the juror expressly stated, in individual questioning, that he would be biased in the case, thus establishing bias as a matter of law.  
Id.
 at 411-12.  Here, unlike the juror in 
Shepherd
, the jurors empaneled from the “block group” merely raised their hands in agreement with another juror.  
See id. 
 This is not bias as a matter of law; thus, the jurors here were able to be rehabilitated.  
See Cortez
, 159 S.W.3d at 92; 
Shepherd
, 926 S.W.2d at 412.  Because the trial court was in a better position to judge the venire members’ sincerity and capacity for fairness, it acted within its discretion by concluding that the “block group” of jurors who raised their hands as if to say, “Me too, Me too” had been rehabilitated.  
See Cortez
, 159 S.W.3d at 93 (holding that if further questioning of an apparently biased venire member shows that the bias no longer exists, then the venire member need not be disqualified). 

Because the jurors were not biased as a matter of law and were successfully rehabilitated by appellees’ counsel and the trial court, the trial court did not abuse its discretion in overruling appellants’ challenges for cause.  Accordingly, we overrule appellants’ three issues.

IV.  Conclusion

Having overruled appellants’ three issues, we affirm the trial court’s judgment.

TERRIE LIVINGSTON

JUSTICE

PANEL A: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

DELIVERED: May 10, 2007

FOOTNOTES
1:
Of this group, seven jurors ended up on the jury: Brandy Rhoades (#3), Daniel Polk (#4), Susan Stratton (#14), Jodi Camp (#24), Joanne Berend (#33), Victoria Hagins (#35), and Frank Keith (#36).

2:
Of this group, eight jurors ended up on the jury:  Brandy Rhoades (#3), Daniel Polk (#4), Susan Stratton (#14), Jodi Camp (#24), Sherry Baker (#26), Joanne Berend (#33), Victoria Hagins (#35), and Frank Keith (#36)
.

3:
Dr. Sudarshan was dismissed from the case and is not a party to this appeal.

4:
Six of those seven were from the original block group: Sandra O’Roark (#8), Dona Rivera (#16), Ron Dodson (#17), Jesse Flick (#18), Mindy Simmons (#27), and Gary Childers (#53).  The seventh was Henry Grieb (#28).  Although Venireperson Simmons eventually said that she could follow instructions, the trial court still granted appellants’ challenge for cause for her.

5:
Of the “block group,” the following venire members made it onto the jury: Brandy Rhoades (#3), Daniel Polk (#4), Susan Stratton (#14), Jodi Camp (#24), Sherry Baker (#26), Joanne Berend (#33), Victoria Hagins (#35), and Frank Keith (#36).