**Lauren TABER, Individually and as Next Friend to Jordan Robinson, A Minor, Appellant**

v.

**Catherine Nguyen ROUSH, M.D. and Plaza Ob–Gyn Associates, P.A., Appellees.**

No. 14–08–00089–CV.

Court of Appeals of Texas, Houston (14th Dist.).

June 17, 2010.

Les Weisbrod, William Arthur Newman, Max Freeman, Dallas, for appellants.

Larry D. Thompson, Suzan Cardwell, Diana L. Faust, Houston, for appellees.

Panel consists of Chief Justice HEDGES and Justices ANDERSON and BOYCE.

## SUBSTITUTE MAJORITY OPINION *

WILLIAM J. BOYCE, Justice.

Appellant Lauren Taber, acting individually and as next friend to her minor son Jordan Robinson, sued appellees Dr. Catherine Nguyen Roush and Plaza Ob–Gyn Associates, P.A. Dr. Roush provided prenatal care to Taber and delivered Jordan, who suffered nerve injuries during birth. Taber attributes Jordan's nerve injuries to Dr. Roush's asserted negligence.[1]

The jury returned a 10–2 verdict in favor of Dr. Roush, answering "no" to a question asking whether the negligence of Dr. Roush, if any, was a proximate cause of the injuries in question. The trial court signed a take-nothing judgment in conformity with the verdict.

On appeal, Taber asks for a new trial predicated on contentions that the trial court erroneously refused to (1) exclude expert testimony relied upon by Dr. Roush; (2) grant a mistrial based on testi-

---

\* We overrule appellant's motion for rehearing. We withdraw our majority opinion issued April 20, 2010, and issue the following substitute majority opinion in its place.

1. Dr. Roush was employed by Plaza Ob–Gyn Associates, P.A. It was uncontested at trial that Dr. Roush acted in the course and scope of her employment at all relevant times. Accordingly, we do not separately address the liability of Plaza Ob–Gyn Associates, P.A.

mony alleged to have violated an order in limine; and (3) strike venire members for cause. She also contends that the trial court's refusals to exclude expert testimony, grant a mistrial, and strike venire members for cause resulted in a jury verdict that is contrary to the great weight and preponderance of the evidence.

We affirm the trial court's judgment.

## Background

Taber was admitted to Park Plaza Hospital in Houston at 7:46 p.m. on October 27, 2002, and remained in the hospital overnight. Dr. Roush was paged and gave orders at 9:48 p.m. Labor was induced because Taber had pregnancy-induced hypertension; she began receiving Pitocin at 6:30 a.m. on October 28, 2002. Dr. Roush performed a vaginal examination at 8:51 a.m. and ruptured Taber's membrane at that time.

Taber's labor progressed during the day on October 28, and Dr. Roush performed another vaginal examination at 1:42 p.m. Dr. Roush examined Taber again about 40 minutes later; after this examination, Taber received epidural anesthetic at 2:35 p.m. Dr. Roush returned at 3:30 p.m. and inserted an intrauterine pressure catheter.

At 5:54 p.m., Dr. Roush was notified by telephone that Taber was fully dilated and had entered the second stage of labor. Dr. Roush instructed the nurses to have Taber begin pushing. At 7:34 p.m., Dr. Roush was called to the hospital for the delivery because Taber had started pushing involuntarily. Dr. Roush testified that she arrived about 15 minutes before Jordan's head delivered.

An entry in the nurse's notes states that the crown of Jordan's head was first observed at 8:06 p.m. At approximately 8:07 p.m., a "turtle sign" occurred when Jordan's head delivered.

A "turtle sign" occurs when a baby's head delivers and then retracts, indicating that shoulder dystocia has occurred. Shoulder dystocia occurs when the baby's shoulder becomes trapped against the mother's symphysis pubis or pubic bone, preventing further descent down the birth canal.

The occurrence of shoulder dystocia greatly increases the chances of injury to the baby's brachial plexus. The brachial plexus is a series of nerves emanating from the neck to form a network or mesh that supplies the shoulder, arm, and hand with movement and feeling. The brachial plexus allows normal and symmetrical growth of the arm and hand in children.

Shoulder dystocia is an obstetric emergency. To avoid brain damage to the baby from lack of oxygen due to cord compression, the shoulder dystocia must be resolved quickly so that the delivery can be completed. According to the textbook *Operative Obstetrics*, "[V]ery few graduating residents have seen or handled more than a few cases" involving shoulder dystocia because it is a rare occurrence. Therefore, "[w]hen presented with a case of shoulder dystocia, the inexperienced obstetrician may panic and become confused, exerting unacceptable and maldirected forces upon the infant's head, and thus producing permanent brachial plexus injury."

At the time of Jordan's delivery, Dr. Roush was less than a year out of residency. She had handled shoulder dystocias before as a resident; this may have been the first shoulder dystocia she handled without an attending physician present.

Medical literature reports that "a clinician's first reaction to a difficult delivery is to exert considerably larger forces than he

normally would."[2] *Operative Obstetrics* reports that "[t]he majority of brachial plexus injuries involve extraction of the child's body within 3 minutes of the delivery of the head, that is, before the end of the next uterine contraction." The American College of Obstetricians and Gynecologists recommends that "[w]hen shoulder dystocia is diagnosed, a deliberate and planned sequence of events should be initiated. Pushing should be halted and obstructive causes should be considered. . . . The presence of another physician experienced in the management of shoulder dystocia is helpful. Additional nursing staff, anesthesia personnel, and pediatricians should be summoned."

Obstetricians have developed maneuvers to address shoulder dystocia. While there is no required order in which these maneuvers must be performed, it is generally accepted that the first two maneuvers attempted should be (1) the McRoberts maneuver, in which the mother's legs are removed from the stirrups and flexed sharply upon the abdomen; and (2) suprapubic pressure, which involves pushing down on the abdomen to push the baby's trapped shoulder out from underneath the pubic bone.

Dr. Roush testified that she diagnosed Jordan's shoulder dystocia within 10 seconds of the "turtle sign." According to an entry in the nurses' notes, Jordan's delivery was complete at 8:08 p.m. During the minute that elapsed between the "turtle sign" at 8:07 p.m. and Jordan's birth at 8:08 p.m., Dr. Roush testified that she told Taber to keep pushing and then successfully resolved the shoulder dystocia involving Jordan's right shoulder; she testified that she did so with the assistance of nurses through application of the McRoberts maneuver and then suprapubic pressure.

The nurses who were present for Jordan's delivery testified that they had no recollection of the delivery independent of what the medical records reveal. The medical records contain nurses' notes; there is no record in the nurses' notes that the McRoberts maneuver and suprapubic pressure were applied. The medical records also contain a delivery note written by Dr. Roush after the delivery stating: "[M]oderate shoulder dystocia resolved with McRoberts and suprapubic pressure."

Dr. Roush testified that she applied traction to Jordan's head after the shoulder dystocia was relieved. She denied applying excessive force to Jordan's head and neck during the delivery, and denied applying upward or downward lateral traction to Jordan's head. Dr. Roush testified that she applied traction to Jordan by pulling "along the axis of the baby." She explained that "the way you place your hands is that you make sure the head and the neck and the shoulders are all in alignment without actually trying to torque the head in any way. So I keep it along the same axis. It is like a straight axis from head to neck down through the shoulders." In contrast to upward or downward lateral traction, Dr. Roush testified that axial traction "is really almost parallel to the floor." Dr. Roush also testified that she "restituted" Jordan's head, meaning that she turned the head so it would be perpendicular to his shoulders, and that the word "twist" is "just a layman's term for restitution."

Jordan's grandmothers observed the birth in the delivery room while flanking Dr. Roush. Both grandmothers testified that Dr. Roush twisted, turned, and pulled on Jordan's head with violent and frightening force. Jordan's father also was pres-

---

**2.** Robert Allen, et al., *Risk Factors for Shoulder Dystocia: An Engineering Study of Clini-* cian–Applied Forces, 77 Obstetrics & Gynecology 352, 354 (1991).

ent in the delivery room at Taber's head. Taber, Jordan's father, and Jordan's grandmothers disputed Dr. Roush's testimony that the McRoberts maneuver and suprapubic pressure were applied.

Dr. Roush testified that four drapes were positioned for Jordan's delivery. According to Dr. Roush's testimony, one drape was placed under Taber's buttocks; one was placed on each leg; and one was placed on her abdomen. Dr. Roush testified that she uses drapes for every delivery. Dr. Roush further testified that "suprapubic pressure is done underneath the drapes and sometimes having the drapes there to a lay person can obscure what maneuvers we are doing." She also testified that the McRoberts maneuver is performed underneath leg drapes, and "[t]hey are not going to see it ... if it's draped." Taber and Jordan's grandmothers testified that drapes were not used during Jordan's delivery.

Sheryl Taber, Jordan's maternal grandmother, testified that she did not recall seeing Dr. Roush push Jordan's head down toward the floor or pull it up toward the ceiling during delivery. Gloria Robinson, Jordan's paternal grandmother, also testified that she did not remember seeing Dr. Roush pull Jordan's head down toward the floor or up toward the ceiling during delivery.

Jordan was born with a limp right arm, which immediately indicated that he had a brachial plexus injury. There are four types of brachial plexus injuries; most are transient and heal on their own or can be repaired surgically. Because most brachial plexus injuries are transient, a permanent brachial plexus injury is not finally diagnosed until it persists for more than a year or is confirmed surgically.

The least severe brachial plexus injury is a neuropraxia or stretch, in which a nerve has been damaged but not torn. The neuropraxia is the most common form of brachial plexus injury and resolves over time. Next on the scale of severity is a neuroma. In a neuroma, a nerve has attempted to heal itself but scar tissue has grown around the injury; this places pressure on the injured nerve and prevents it from conducting signals to the muscles. Next is a rupture, in which a nerve is torn but not at the spinal attachment. The most severe brachial plexus injury is an avulsion, which occurs when a brachial plexus nerve root is physically pulled out of the spinal cord. A brachial plexus avulsion is permanent and cannot be repaired.

Jordan eventually was diagnosed as having an avulsion of the C7 nerve root and a partial avulsion of the C5 nerve root. He also was diagnosed as having neuromas.

At trial, Taber contended that Dr. Roush breached the standard of care during Jordan's delivery by (among other things) applying excessive force to Jordan's head in response to the shoulder dystocia, and that this conduct caused Jordan's permanent brachial plexus injury. Taber supported these contentions with expert testimony; the admissibility of the opinions proffered by Taber's expert is not challenged.

Dr. Roush agreed during her testimony that brachial plexus injuries "more often than not" result from downward traction to the head applied by the doctor during delivery of the trapped shoulder. However, Dr. Roush contended that brachial plexus injuries also can result from natural forces of labor during birth. Dr. Roush relied upon her own testimony as an expert; she also relied upon testimony from two other experts who opined that brachial plexus injuries can result not only from excessive force applied by the delivering physician, but also from natural forces of labor.

Taber filed a motion before trial challenging the reliability of the opinions proffered by Dr. Roush's experts and asked the trial court to exclude those opinions from the jury's consideration. Taber asserted that "there is no scientific or medical evidence to support a permanent brachial plexus injury, and in particular an avulsion, in utero from the maternal forces of labor where you have an otherwise healthy baby." According to Taber, "This is an unsupportable scientific hypothesis created by [appellees] in an effort to avoid responsibility in malpractice actions." The trial court denied Taber's motion and allowed Dr. Roush and her retained experts to testify regarding the maternal forces of labor theory.

The jury answered "no" to the single liability question submitted on Taber's negligence claim, and the trial court signed a take-nothing judgment in conformity with that verdict. Appellant filed a motion for new trial, which the trial court denied. This appeal followed.

## Analysis

Taber raises four issues on appeal.

First, Taber challenges the expert testimony relied upon by Dr. Roush as being unreliable and inadmissible. Taber contends this testimony is based on controversial medical literature that suggests maternal forces of labor may cause some forms of brachial plexus injury. Taber argues that this opinion testimony is unreliable because (1) the literature upon which it relies consists primarily of anecdotal case reports and speculative hypotheses; and (2) there is an analytical gap between the nonspecific brachial plexus injuries discussed in the literature and Jordan's avulsion injury. Taber contends that the trial court erred by denying a motion to exclude the challenged testimony.

Second, Taber contends that Dr. Roush violated an agreed order in limine and a subsequent agreement when she referred during her testimony to her desire to show to the jury an example of surgical drapes. According to Dr. Roush, these drapes were in place during the delivery and may have obscured the view of others in the room who witnessed the delivery. Taber contends that the trial court erred by denying a motion for mistrial predicated on Dr. Roush's statement.

Third, Taber contends that the trial court erred by denying her motion to strike potential jurors for cause.

Fourth, Taber contends that the three asserted errors listed above caused the jury to make a "no" finding in response to Question No. 1 that is contrary to the great weight and preponderance of the evidence.

We address each issue in turn.

## I. Admission of Expert Opinion Testimony

### A. Standard of Review

▇▇▇ " 'If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.' " *Cooper Tire & Rubber Co. v. Mendez,* 204 S.W.3d 797, 800 (Tex.2006) (quoting Tex.R. Evid. 702); *see also Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 588–89, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Expert testimony is admissible when (1) the expert is qualified, and (2) the testimony is relevant and based on a reliable foundation. *Mendez,* 204 S.W.3d at 800. If the expert's scientific evidence is not reliable, it is not evidence. *Id.* Courts must determine reliability from all of the

evidence. *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 720 (Tex.1997); *see also In the Interest of J.B.,* 93 S.W.3d 609, 620 (Tex.App.-Waco 2002, pet. denied).

The trial court's determination that these requirements are met is reviewed for abuse of discretion. *Mendez,* 204 S.W.3d at 800. The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles. *Id.* Admission of expert testimony that does not meet the reliability requirement is an abuse of discretion. *Id.* Expert testimony must be based on a reliable foundation of scientific or professional technique or principle. *Wiggs v. All Saints Health Sys.,* 124 S.W.3d 407, 410 (Tex.App.-Fort Worth 2003, pet. denied) (citing *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 557 (Tex.1995)). When the expert's underlying scientific technique or principle is unreliable, the expert's opinion is no more than subjective belief or unsupported speculation and is inadmissible. *Id.* Causation opinions predicated on possibility, speculation, and surmise are no evidence. *Havner,* 953 S.W.2d at 711–12.

In *Robinson,* the Texas Supreme Court set forth six non-exclusive factors to assist courts in determining whether expert testimony is admissible. *Robinson,* 923 S.W.2d at 557. The Texas Supreme Court subsequently explained that the *Robinson* factors cannot always be used in assessing an expert's reliability but concluded there must be some basis for the opinion offered to show its reliability. *Mendez,* 204 S.W.3d at 801 (citing *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726 (Tex.1998)). In those circumstances, expert testimony is unreliable if there is simply too great an analytical gap between the data and the opinion proffered. *Mendez,* 204 S.W.3d at 800. A

reviewing court is not required to ignore gaps in an expert's analysis or assertions that are simply incorrect, and a trial court is not required to admit evidence connected to existing data only by the expert's *ipse dixit. Id.* at 800–01. Bald assurances of validity do not suffice. *Havner,* 953 S.W.2d at 712. The underlying data should be independently evaluated in determining if the opinion itself is reliable. *Id.* at 713.

### B. The Challenged Expert Testimony

The causation dispute at trial centered on a battle of the experts. The opposing experts' qualifications to opine about the cause of Jordan's brachial plexus injury are not challenged. The substance of those opinions is hotly contested.

The challenged expert testimony addresses the defense's contention that brachial plexus injuries during birth can be caused by the natural forces of labor. Before delving into Taber's specific criticisms of this contention, it is helpful to describe more fully the parties' competing explanations for the mechanism of Jordan's nerve injury.

Taber relied upon expert testimony from Dr. Charles Bloom, a board certified obstetrician and gynecologist. Among other things, Dr. Bloom testified as follows.

- Natural expulsive forces of labor cannot cause an avulsion injury to the brachial plexus like the one Jordan suffered.
- "In the entire archives of medical literature, I am unaware and we have yet to produce an article today that shows that an unattended delivery, that is a deliver[y] through the natural forces of labor, has produced an avulsion, the nature of which Jordan Robinson sustained."
- "The only plausible and probable explanation for Jordan Robinson's bra-

chial plexus avulsion or tear is that excessive stress was placed—stretch, not compression, but stretch was placed on that nerve strong enough to rip the nerves from their insertion into the spinal cord."

- Dr. Roush "had to have applied excessive force based on everything I know about the physics of this."

- Dr. Bloom was not aware of any case in which an avulsion injury resulted from a mechanism other than excessive force applied during delivery.

- "It's my medical/legal opinion that most probably there was excess force applied to Jordan Robinson's head that caused the brachial plexus injury and may have resulted in the release of the shoulder dystocia."

- Dr. Bloom agreed with an assertion that "there is, in fact, a lot of medical literature that states that avulsions are caused by improper traction."

- Dr. Bloom also agreed with an assertion that "[t]here is no medical literature that states that avulsions are only caused by downward lateral traction." In a separate question, Dr. Roush's attorney asked: "Is there any medical literature out there that says that avulsions specifically are caused solely and exclusively by downward lateral traction?" Dr. Bloom responded: "No, there is no literature that says it is exclusive."

- Dr. Bloom agreed with an assertion that "the forces of labor can create [a] situation with the brachial plexus that's under tension. . . ."

- The presence of shoulder dystocia as indicated by the "turtle sign" meant that Jordan's brachial plexus nerves already were being stretched before Dr. Roush touched his head during the delivery.

- Dr. Bloom agreed with an assertion that the difference between a temporary injury to the brachial plexus nerves and a permanent injury "is a matter of degree of stretch."

The defense relied upon expert testimony from Dr. Roush, who is board certified in obstetrics and gynecology, and from Drs. Graham and Vadasz.

Dr. Roush testified as follows.

- "In this particular instance, I think that what has happened here is either an intrapartum cause or a cause where the shoulder dystocia developed and with the maternal expulsive forces of the contractions just caused that stretch injury to occur. I think that's the most likely cause in this case."

- ". . . I think there was some injury there prior to my even laying hands on the baby's head, because from the dystocia that was—that I encountered, it was just—it wasn't a very excessive dystocia. I did not have to resort to delivering the posterior arm or any other maneuvers."

- She denied applying excessive force to Jordan's head and neck during the delivery.

- "He can get . . . a brachial plexus injury from excessive downward lateral traction, excessive upward lateral traction, and any excessive rotation."

- She applied traction to Jordan only after the shoulder dystocia already had been relieved through application of the McRoberts maneuver and suprapubic pressure, and she applied only axial traction. Axial traction does not cause or contribute to a brachial plexus injury. She did not apply upward or downward lateral traction.

- There is no reported case that says the mechanism of injury described by Dr. Roush can cause an avulsion.

- She could identify no literature saying that an avulsion will occur without the use of excessive force in circumstances involving shoulder dystocia during the delivery of an otherwise healthy baby.
- She could identify no literature saying that "if there's an avulsion injury, there has to be an excessive lateral traction or twisting of the fetal head[.]"

Dr. Graham, who is board certified in obstetrics and gynecology and in maternal fetal medicine, testified as follows in support of Dr. Roush.

- Dr. Graham identified two causes of movement of a baby's head during delivery leading to a brachial plexus injury. "[I]t can be by traction, which is described as the physician pulling, pulling down on the head, or other possibilities are the propulsive mechanisms, which is the uterus contraction itself which is forcing the baby out or the mother is pushing which is forcing the baby out."
- Dr. Graham testified that the neck and the side of the face ordinarily form a 90–degree angle. "When that shoulder is impinged against that bone, the body and the head continue to move forward, the shoulder can't. So what happens to that 90–degree angle? That angle is increased and that's what caused the damage to the brachial plexus."
- Dr. Roush's counsel asked: "Is there a relationship between the anatomy of an individual brachial plexus on an infant, is there a correlation between that anatomy and whether there is a predisposition to a brachial plexus injury or a vulnerability to a brachial plexus injury?" Dr. Graham responded that "you have to have the brachial plexus that has the susceptibility or the vulnerability to be damaged in or-

der for it to be damaged, otherwise it would not be [a]ffected. So, there needs to be something inherent with that brachial plexus that allows it to be damaged. Now, what that something is is what no one knows."
- Dr. Roush's counsel asked: "Has anybody determined up to this day as to what is causing brachial plexus injuries?" Dr. Graham responded: "To the best of my knowledge, it's come down to this tugging, like a wagon, or the propulsion theory, something that drives that anterior shoulder into the pubic bone and increases that angle from the normal angle that allows that susceptible brachial plexus to be damaged."
- Dr. Graham said "I would not disagree with that" when asked whether the concept of maternal forces of labor as a cause of temporary brachial plexus injuries is referred to in articles as a "hypothesis."
- The American Journal of Obstetrics and Gynecology and the publication Obstetrics and Gynecology both are peer-reviewed journals. Obstetrics and Gynecology is published by the American College of Obstetricians and Gynecologists ("ACOG"). Articles published by these journals are reliable because they "have been reviewed by people expert in the area that the article is addressed [to] and [they] have found it satisfactory to be dispensed for reading by the rest of the obstetricians and perinatologists around the country."
- Dr. Graham agreed with an assertion that one goal of ACOG "is to write articles to defend lawsuits."
- Dr. Roush's counsel asked: "Doctor, given the fact that there is no documented traction and no evidence of traction in Jordan Robinson's case, is

it more or less likely that he probably had a vulnerable plexus?" Dr. Graham answered: "He would, in my opinion, it would be a vulnerable brachial plexus, yes, sir."

- Dr. Graham had "not seen avulsion addressed in the obstetrical literature." Taber's counsel asked: "And for an avulsion, there is no literature for an avulsion? There is no literature that you have seen that proves anything else as a possible etiology, is there, sir?" Dr. Graham responded, "That proves it, no."

Dr. Andrew Vadasz, who is board certified in neurology, neurophysiology, and pediatrics, also testified in support of Dr. Roush. He testified as follows.

- Downward lateral traction during delivery can be one cause of a brachial plexus injury.

- "[T]here is genetic and individual susceptibility, as some of this research has pointed out, in—from one child to the next. As so forces that are used to assist in the delivery may in some cases result in injury and other cases they don't."

- In a shoulder dystocia situation, "the brachial plexus is already under stretch. It's already under—it's already being stretched even before— you know, as the head is coming out, before the doctor's even touching the baby, the brachial plexus is being stretched . . . ."

- The nerve root is "the weak link in the system" of nerves that makes up the brachial plexus. This means "an avulsion doesn't necessarily require greater forces than—than an injury to the brachial plexus would require. It's a weak link."

- Taber's counsel asked: "There's certainly a wide body of literature out there, isn't there, Doctor, that sup-

ports the theory or the conclusion that excessive downward lateral . . . traction can be a cause of brachial plexus injury, true?" Dr. Vadasz responded: "[T]hat's considered one of the sources? It's considered a potential source, yes. But that theory is now in—being disputed."

- The presence of a brachial plexus injury does not necessarily indicate that a physician applied excessive force during delivery. "[T]here's numerous cases and . . . I've got the literature here, that clearly document[s] that the physician[s] in some cases are not even involved in the delivery and a child was found to have a brachial plexus injury."

- The "literature is changing."

These competing expert opinions were proffered against a backdrop of conflicting testimony regarding certain facts surrounding Jordan's delivery.

Dr. Roush testified that she did not use excessive force; denied using upward or downward lateral traction on Jordan's head; and denied twisting Jordan's head. She testified that the McRoberts maneuver and suprapubic pressure were applied to relieve the shoulder dystocia, after which she restituted Jordan's head and used axial traction to guide him out by pulling "along the axis of the baby" parallel to the floor. She also testified that she used drapes. Jordan's grandmothers, Sheryl Taber and Gloria Robinson, witnessed the delivery. Both grandmothers testified that the McRoberts maneuver and suprapubic pressure were not applied. Both testified that they did not remember seeing Dr. Roush push Jordan's head towards the floor or pull it up toward the ceiling. Both testified that Dr. Roush twisted Jordan's head and pulled on it

violently. Taber and Jordan's grandmothers testified that drapes were not used.

## C. Gauging the Expert Testimony's Admissibility

■ The challenged opinions regarding natural forces of labor as a cause of brachial plexus injury must be assessed according to the well-established factors for gauging the admissibility of expert testimony. Those factors are (1) the extent to which the theory has or can be tested; (2) the extent to which the technique relies on the expert's subjective interpretation; (3) whether the theory has been subject to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the nonjudicial uses that have been made of the theory or technique. *Mendez*, 204 S.W.3d at 801 (citing *Robinson*, 923 S.W.2d at 557).

### 1. Testing and potential error rate

In the specific context of this case, factors (1) and (4) go to Taber's criticism of reliance upon retrospective studies to support the natural forces of labor theory and the accompanying concern regarding ascertainment bias.

■ Taber challenges the reliability of the natural forces of labor theory because it relies on retrospective studies rather than prospective studies. A retrospective study analyzes existing medical records; in contrast, Dr. Bloom explained that a prospective study "set[s] the determination of what you are going to do, the parameters of your study prior to the study being performed, as opposed to anecdotal evidence looking backward in time historically."

Generally speaking, retrospective studies are considered to be less reliable than prospective studies because of the potential for inclusion of inaccurate, incomplete or inconsistent information in the records being reviewed. One aspect of this reliability concern involves ascertainment bias—"the possible over-or under-reporting of shoulder dystocia in the underlying data" that is being relied upon. *See Potter v. Bowman*, No. 05–CV–00827–REB–PAC, 2006 WL 3760267, at *2 (D.Colo. Dec. 18, 2006).

The Texas Supreme Court has noted that "[t]esting is not always required to support an expert's opinion, but lack of relevant testing to the extent it was possible, either by the expert or others, is one factor that points toward a determination that an expert opinion is unreliable." *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 642 (Tex.2009) (citing *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 580 (Tex. 2006), *Mendez*, 204 S.W.3d at 802, and *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 906 (Tex.2004)). "If testing of critical aspects of an expert's testimony has not taken place either by the expert or others in the relevant scientific or expert community, then an explanation of why it has not is an important consideration in evaluating the expert opinions and determining whether they are substantively more than merely the expert's conclusory, subjective opinion." *Whirlpool Corp.*, 298 S.W.3d at 642–43.

The dearth of prospective testing in support of the natural forces of labor theory is explained by ethical considerations that preclude a prospective study subjecting mothers and babies to potential injury while measuring excessive traction. *See Ford v. Eicher*, 220 P.3d 939, 945 (Colo. App.2008, cert. granted) ("[T]he trial court overlooked the evidence in the record establishing that there is *no ethical way* in which to test the in utero causation theory of brachial plexus injury or to measure

how much traction is 'excessive' without subjecting mothers and their infants to potentially injurious conduct.") (original emphasis). This is the explanation demanded by *Whirlpool Corp.*, 298 S.W.3d at 642–43; it provides assurance that the absence of prospective testing of the natural forces explanation is attributable to unique considerations governing this specific medical issue rather than inherent deficiencies in the challenged expert opinions.[3] The concern regarding ascertainment bias in connection with retrospective hospital record studies of brachial plexus injuries is legitimate, but this concern goes to weight rather than admissibility. *See Potter*, 2006 WL 3760267, at *2; *see also D'Amore v. Cardwell*, 2008 WL 852791, at *6–*7 (Ohio Ct.App. No. L–06–1342, Mar. 31, 2008). This concern is properly addressed by cross-examination rather than exclusion. *See Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 40–41 (Tex.2007).[4]

Taber's challenges predicated on reliance upon retrospective studies and the potential for ascertainment bias do not warrant exclusion of the disputed expert testimony regarding the cause of Jordan's brachial plexus injury.

## 2. Subjective interpretation, support from peer-reviewed studies, and "analytical gap"

■ Factors (2) and (3) go to Taber's contention that the challenged expert testimony is unduly subjective and lacks support from peer-reviewed medical literature addressing natural forces of labor as a cause of brachial plexus injuries. Taber contends that support is lacking because there is an "analytical gap" between nonspecific brachial plexus injuries discussed in the literature and the particular avulsion injury Jordan suffered.

The parties' arguments regarding this asserted analytical gap cannot be addressed on appeal by weighing the relative persuasive power of competing medical articles in a vacuum; by eschewing analysis of the testimony; or by asking in the abstract whether an excessive lateral traction explanation for brachial plexus injuries has more medical merit than a natural forces of labor explanation. Courts are not equipped to make medical judgments

---

3. Taber contends that an article from Sweden describes a prospective study supporting the excessive traction explanation for brachial plexus injuries during birth. *See* Mollberg, et al., *Acta Obstetrica et Gynecologica*, 2007 Volume 86. Dr. Graham criticized this study, asserting that it is not reliable and would not survive peer review in the United States because it involved an intentional effort to create an Erb's palsy through use of traction on the head. Regardless of whether this criticism of the Swedish prospective study is valid, the absence of corresponding prospective studies supporting the natural forces of labor theory is sufficiently explained on this record. *See Whirlpool Corp.*, 298 S.W.3d at 642–43.

4. The dissent's stated concern regarding reliance upon retrospective studies of hospital records serves as its only basis for rejecting at least six of the articles relied upon by Dr. Roush. *See* Robert B. Gherman et al., *Bra-*

*chial Plexus Palsy: An in Utero Injury?*, 180 Am. J. Obstetrics & Gynecology 1303 (1999); Robert G. Gherman et al., *Spontaneous Vaginal Delivery: A Risk Factor for Erb's Palsy?*, 178 Am. J. Obstetrics & Gynecology 423 (1998); Joseph G. Ouzounian et al., *Permanent Erb's Palsy: A Lack of a Relationship with Obstetrical Risk Factors*, 15 Am.J. Perinatology 221 (1998); Ernest M. Graham et al., *A Retrospective Analysis of Erb's Palsy Cases and Their Relation to Birth Weight and Trauma at Delivery*, 61 Maternal–Fetal Med. 1 (1997); David Peleg et al., *Fractured Clavicle and Erb's Palsy Unrelated to Birth Trauma*, 177 Am. J. Obstetrics & Gynecology 1038 (1997); Gary D.V. Hankins et al., *Brachial Plexus Palsy Involving the Posterior Shoulder at Spontaneous Vaginal Delivery*, 12 Am. J Perinatology 55 (1995). The dissent offers no other basis for discounting or ignoring these articles.

of this nature, and they are not called upon to do so. *See TXI Transp. Co. v. Hughes,* 306 S.W.3d 230, 239 (Tex.2010) ("The court's ultimate task, however, is not to determine whether the expert's conclusions are correct, but rather whether the analysis the expert used to reach those conclusions is reliable and therefore admissible.") (citing *Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 629 (Tex.2002), and *Gammill,* 972 S.W.2d at 728).

Fair and equitable application of the standards governing admissibility of expert testimony begins with fidelity to the record. The specific legal task this court is called upon to perform—applying the governing legal standards to determine admissibility of particular expert testimony at a trial focused on Jordan's delivery—must be accomplished in the context of specific testimony. This context encompasses not only the disputed expert testimony itself, but also Taber's competing expert testimony and the testimony of fact witnesses.

The doctors testifying in support of Dr. Roush acknowledged that no medical literature attributes permanent avulsion injuries like the one Jordan suffered to the natural forces of labor. Dr. Bloom, testifying in support of Lauren Taber, acknowledged that no medical literature says permanent avulsion injuries like the one Jordan suffered result only from excessive lateral traction during delivery.

Dr. Bloom testified that he knew "with 100 percent certainty" that Jordan's neck was subjected to "excessive stretch," meaning "enough stretch to rupture the brachial plexus nerves C5 through 7." He continued, "What I don't know is exactly how, when it was done. So was it lateral? Was it rotation and upward? Was it rotation and sideways? Was it rotation and downward?" He concluded, "I really couldn't speculate as to—again, speculation—but I couldn't state exactly how it

happened, but with, to a reasonable degree of medical probability, excess traction was applied and enough traction, enough stretch was applied to rupture ... the brachial plexus."

Uncertainty regarding the specific mechanism of injury was underscored by the following exchange during Dr. Bloom's cross-examination.

Q. Next, what I would like to do is show you a title—a journal titled Brachial Plexus Associated With Caesarian Section & In Utero Injury by Dr. Gherman ... and this is from the American Journal of Obstetrics & Gynecology from 1999.

"The injury attributed to excessive lateral traction ranges from limited nerve dysfunction to root avulsion with subsequent permanent damage. We have presented six cases in which it is virtually certain that this mechanism played no role. It is remarkable that in all six of the described Erb's palsies [there was] evidence of persistent nerve root avulsion at age one year, a time at which continued nerve dysfunction is equivalent to permanent nerve injury."

So Dr. Gherman, in his study that was accepted in a peer-reviewed journal, said that there was [sic] nerve root avulsions in which traction played no role. Correct?

A. That's what it said there.

Q. And I suppose that you would disagree with Dr. Gherman and the American Journal of Obstetrics & Gynecology, wouldn't you?

A. Well, it's hard to disagree and it is hard to agree. It lends itself open to interpretation.

In later testimony during re-direct examination, Dr. Bloom returned to this article discussing six cases involving per-

manent brachial plexus injuries following deliveries by caesarian section.

Q. Well, now, that one piece—article that he showed you about the Caesarian sections and injuries, what's the problem with that article in terms of what happened? Does it show us what happened before the Caesarian section?

A. Well, again, that's a total of six cases, and it addresses each individual, but there were problems with prolonged arrests in five of the six cases. And one of the ways you can get a brachial plexus injury is through a difficult Caesarian where you have allowed the baby to labor very far down and the baby's head gets stuck, and by pulling—anybody who's done Caesarians and any skillful obstetrician knows when you get a baby whose head is down that far and you start pulling, what you frequently have to do is get somebody actually below the drapes—hard to believe, but below the drapes, underneath, and push that baby's head up as you pull up to prevent injury to the brachial plexus. Five of the six of those cases in that article had that exact clinical situation. Whether or not—that's just the plausible explanation for that even though there was a[ ] Caesarian.

There was one other case that was not related to that, but we do not know the circumstances of how big the incision was, what was involved. Apparently—I think there was a fibroid that may have been … in the way, where again, you have the same situation through the pelvis, and if you don't make a big enough incision and you yank too hard, you can injure the baby.

Dr. Graham subsequently addressed Dr. Bloom's testimony regarding Dr. Gherman's article discussing the six case studies.

Q. Okay. The conclusion of this article is—let me get it where we can all see it. Can you read what I have highlighted there?

A. "Brachial plexus palsy can be associated with Caesarian delivery. Such palsies appear to be of intrauterine origin and are more likely to persist."

Q. Now, Dr. Bloom had testified on Thursday that this study had to do with Caesarian deliveries where the head had become engaged and, therefore, was more difficult to extract and therefore could have been a traumatic delivery. What do[ ] the results there have to say about that?

A. Well, the results say that they excluded the nine cases of brachial plexus injury associated with a breached delivery and the two cases where the operative report documented difficulty with delivery of the head, so they tried to remove confounding factors.

Q. So in these six cases, you have read this article, have you not?

A. Yes, sir.

Q. I am not going to go into a lot of detail except to point out on the last page, if you can read the persistence of palsy—can you read that, please?

A. "The persistence of the palsy in all six of these infants suggests a[ ] qualitatively different mechanism of injury. Long-standing in utero stretching of the brachial plexus may represent a common unifying basis accounting for the permanency of these injuries."

Q. By—let me get my word right—permanence of these injuries. So they had determined through this study that these injuries were permanent?

A. That's what their implication was.

In short, this record demonstrates that both Taber and Dr. Roush relied on a degree of "interpretation" (to use Dr.

Bloom's word) in applying the existing literature to opine about causation based upon specific circumstances surrounding Jordan's birth. Notwithstanding the severity of Jordan's avulsion injury, Drs. Roush, Graham, and Vadasz relied on testimony regarding the absence of upward and downward lateral traction in the course of concluding that other factors caused the injury. Notwithstanding testimony from Dr. Roush regarding the absence of upward and downward lateral traction, and the grandmothers' testimony that they did not recall seeing Dr. Roush apply upward or downward lateral traction to Jordan's head, Dr. Bloom relied on the severity of Jordan's avulsion injury in the course of concluding that it was caused by excessive traction.

Both sides looked for support in the medical literature. The experts testifying on behalf of Dr. Roush relied in significant part on peer-reviewed articles appearing in the American Journal of Obstetrics and Gynecology, along with other medical journal articles and textbooks. Articles from the American Journal of Obstetrics and Gynecology account for at least nine of the 22 publications relied upon by Dr. Roush and her experts.[5] This collection included Dr. Gherman's peer-reviewed 1999 caesarian section article, which was discussed at length in the testimony as set forth above. On this record, the trial court had a valid basis for concluding that the asserted gap had been bridged as between (1) natural forces of labor as an explanation for brachial plexus injuries in general; and (2) Jordan's specific avulsion injury. This record warranted submission of testimony regarding a natural forces of labor explanation for the jury's consideration in deciding a causation issue that—as Dr. Bloom noted—unavoidably involves an element of speculation.[6]

5. Robert H. Allen & Edith D. Gurewitsch, *Temporary Erb–Duchenne Palsy Without Shoulder Dystocia or Traction to the Fetal Head*, 105 Am. J. Obstetrics & Gynecology 1210 (2005); Robert B. Gherman et al., *Brachial Plexus Palsy Associated with Caesarian Section: An In Utero Injury?*, 177 Am. J. Obstetrics & Gynecology 1162 (1997); Robert B. Gherman et al., *Brachial Plexus Palsy: An in Utero Injury?*, 180 Am. J. Obstetrics & Gynecology 1303 (1999); Robert B. Gherman et al., *Shoulder Dystocia: The Unpreventable Obstetric Emergency with Empiric Management Guidelines*, 195 Am. J. Obstetrics & Gynecology 657 (2006); Robert G. Gherman et al., *Spontaneous Vaginal Delivery: A Risk Factor for Erb's Palsy?*, 178 Am. J. Obstetrics & Gynecology 423 (1998); Bernard Gonik et al., *Mathematic Modeling of Forces Associated with Shoulder Dystocia: A Comparison of Endogenous and Exogenous Sources*, 182 Am. J. Obstetrics & Gynecology 689 (2000); Bernard Gonik et al., *Prediction of Brachial Plexus Stretching During Shoulder Dystocia Using a Computer Simulation Model*, 189 Am. J. Obstetrics & Gynecology 1168 (2003); Raymond J. Jennett et al., *Erb's Palsy Contrasted with Klumpke's and Total Palsy: Different Mechanisms are Involved*, 186 Am. J. Obstetrics & Gynecology 1216 (2002); David Peleg et al., *Fractured Clavicle and Erb's Palsy Unrelated to Birth Trauma*, 177 Am. J. Obstetrics & Gynecology 1038 (1997).

6. The dissent overreaches when it asserts that the body of literature relied upon by Dr. Roush "began with the conclusion that the maternal forces of labor can cause a brachial plexus injury and then did research, usually by simply excluding contrary studies, which supported the desired conclusion." 316 S.W.3d at 179. The dissent overreaches again when it asserts that the natural forces of labor theory "has no established use outside the area of litigation" and has been "manufactured by a small number of doctors laboring to create a defense to lawsuits of this type." These sweeping pronouncements ignore extensive testimony regarding the peer review process that leads to publication of articles in medical journals including the American Journal of Obstetrics and Gynecology. Dr. Graham testified that all articles appearing in this publication "are peer-reviewed by experts in that particular area, and the editors then rely on those panels of experts to render an opinion whether that article is qualified to be published." The expert panels "review for appropriateness [and] ... for ac-

Similar cases from other states inform our analysis of Taber's "analytical gap" argument. In *D'Amore*, the Court of Appeals of Ohio addressed the admissibility of expert testimony regarding causation of an alleged brachial plexus avulsion attributed to the delivering doctor's use of excessive traction. 2008 WL 852791, at *6–*7.[7] The appellate court concluded that the trial court acted within its discretion by overruling a motion in limine and allowing two medical experts to testify "regarding the in utero causation theory of brachial plexus injuries and their opinions as to an alternative cause of the injury to Hannah D'Amore other than excess lateral traction." *Id.* at *7. One of the defense experts at issue was Dr. Gherman. *Id.* at *6.

In so holding, the court of appeals stressed in *D'Amore* that "[t]he trial court's role is not to evaluate which competing scientific analysis or conclusion is correct." *Id.* at *7. "Under *Daubert* and Evid. R. 702, the trial court is to determine whether expert opinion testimony is sufficiently relevant and reliable to be admitted into evidence for jury consideration." *Id.* "Where the evidence is admitted, it is for the jury to decide the weight to give such testimony." *Id.*[8]

A decision from Colorado also has addressed the admissibility of expert testimony supporting the natural forces of labor theory to explain causation of an avulsion injury to the brachial plexus during birth. *See Ford*, 220 P.3d at 941–47.

The delivery at issue in *Ford* involved shoulder dystocia. *Id.* at 941. The defendant doctor testified that he used the McRoberts maneuver and suprapubic pressure to dislodge the impacted shoulder, and then applied traction to deliver the baby. *Id.* at 942. The baby was diagnosed with a "brachial plexus injury to the right shoulder." *Id.*[9] In a subsequent

curacy" and raise questions if necessary to explore the articles' scientific validity. Any such questions must be answered to the expert panels' satisfaction before an article will be accepted for publication. This process ensures that the "articles have been reviewed by people expert in the area ... [who] have found it satisfactory to be dispensed for reading by the rest of the obstetricians and perinatologists around the country."

7. The claimants in *D'Amore* contended that Hannah D'Amore suffered a brachial plexus nerve root avulsion. 2008 WL 852791, at *2. The court of appeals concluded that inconsistent testimony from one of Hannah D'Amore's treating physicians raised a jury question as to the exact nature of the permanent nerve root injury she sustained. *Id.*

8. As indicated in the quote from *D'Amore*, Ohio has adopted the *Daubert* guidelines for determining reliability and admissibility of expert scientific testimony. *See Terry v. Caputo*, 115 Ohio St.3d 351, 875 N.E.2d 72, 77–78 (2007). Admission of expert testimony is proper if (1) the expert is qualified to testify regarding the matters to be addressed; (2) the expert's methodology is sufficiently reliable;

and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See, e.g., Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 687 N.E.2d 735, 739–40 (1998). Reliability is assessed by considering whether the method or theory relied upon (1) has been tested; (2) has been subjected to peer review; (3) has a known or potential rate of error; and (4) is generally accepted in the scientific community. *Id.* at 740.

9. The published appellate opinion in *Ford* does not specify the injury's exact nature. *See Ford*, 220 P.3d at 942. A copy of the motion filed in the trial court in *Ford* to exclude certain expert testimony regarding the natural forces of labor theory was included as an attachment to the Brief in Support of Plaintiffs' *Daubert/Robinson* Motion Regarding Causation and in support of Plaintiffs' Motion in Limine No. 56 filed in this case by Lauren Taber on September 17, 2007. The *Ford* trial court motion states, "As a result of trauma during her delivery, Catherine Ford suffered an avulsion of the C–7 nerve root, the most severe type of injury, in which her C–7

medical malpractice action, the plaintiff asserted (among other things) that the defendant doctor applied excessive traction to deliver the baby. *Id.* The jury returned a verdict for the plaintiff after the court granted the plaintiff's pretrial motion to preclude two defense experts from expressing opinions regarding the cause of the baby's injury, and the defendant doctor appealed. *Id.*

Applying admissibility standards that parallel those used in Texas,[10] the court of appeals reversed the trial court's judgment and remanded for a new trial because the trial court abused its discretion in excluding causation testimony from the defendant doctor's experts. *Id.* at 943–48. The experts were prepared to testify that the injury to the baby's right brachial plexus "occurred prior to Dr. Eicher's efforts to deliver the anterior shoulder;" that her "injury was not caused by anything that Dr. Eicher did or didn't do;" and that "a planned [caesarian] section would not necessarily have prevented injury to [her]." *Id.* at 943.[11] In support of these opinions, the defendant doctor's experts relied on a number of the same articles that Dr. Roush's experts rely upon in this case.[12]

In holding that the trial court erred by excluding the challenged expert opinions as being scientifically unreliable, the court of appeals stressed that the trial court applied an incorrect legal standard. *Id.* at 944. "Instead of evaluating whether the theory propounded ... was reasonably reliable ... the trial court determined which medical theory of causation was more plausible." *Id.* "This is beyond the trial court's gatekeeping function." *Id.*[13]; *see also*

---

nerve root was torn from its attachment to the spinal court. Additionally, Catherine Ford suffered two ruptures, the second most severe type of injury, which are torn nerve roots, further down the nerve root from where they attach to the spine."

10. *See People v. Shreck*, 22 P.3d 68, 77–78 (Colo.2001); Colo. R. Evid. 702. "The purpose of a CRE 702 inquiry is to determine whether the proffered scientific evidence is reliable and relevant, and for the trial court—acting as a gatekeeper—to prevent the admission of 'junk science.' " *Ford*, 220 P.3d at 942 (citations omitted). To perform these tasks, Colorado courts are instructed to consider (1) whether the scientific principles to which the witness is testifying are reasonably reliable; (2) whether the witness is qualified to express an opinion on such matters; and (3) whether the witness's testimony would be useful to the jury. *See Shreck*, 22 P.3d at 78. Other relevant factors may include (1) whether the technique can be and has been tested; (2) whether it has been subject to peer review and publication; (3) the existence and maintenance of standards controlling the operation of the technique; (4) the frequency and type of error generated by the technique; and (5) whether such evidence has been offered in previous cases to support the merits of a particular scientific procedure. *Id.* at 77–78.

11. According to the trial court motion in *Ford*, the defendant doctor's experts "contend that the natural forces from uterine contractions may have compressed the posterior shoulder of Catherine Ford against the sacral promontory causing her severe brachial plexus injury before her head ever emerged from the vagina and, therefore, before Dr. Eicher ever could have applied traction to her neck."

12. Robert H. Allen & Edith D. Gurewitsch, *Temporary Erb–Duchenne Palsy Without Shoulder Dystocia or Traction to the Fetal Head*, 105 Am. J. Obstetrics & Gynecology 1210 (2005); Robert B. Gherman et al., *Brachial Plexus Palsy: An in Utero Injury?*, 180 Am. J. Obstetrics & Gynecology 1303 (1999); Herbert F. Sandmire & Robert K. DeMott, *Erb's Palsy Causation: A Historical Perspective*, 29 Birth 52 (2002); Herbert F. Sandmire & Robert K. DeMott, *Erb's Palsy: Concepts of Causation*, 95 Am. C. Obstetrics & Gynecology 941 (2000).

13. On December 14, 2009, the Colorado Supreme Court granted a petition for writ of certiorari in *Ford* addressing the following issue: "Whether the court of appeals properly applied *People v. Shreck*, 22 P.3d 68 (Colo. 2001), and *People v. Ramirez*, 155 P.3d 371 (Colo.2007), in its review of the trial court's

*Luster v. Brinkman,* 205 P.3d 410, 414–15 (Colo.App.2008); *Potter,* 2006 WL 3760267, at *2; *cf. Salvant v. State,* 935 So.2d 646, 659 (La.2006) (sufficient evidence supported findings that physicians did not cause baby's brachial plexus injury, "in which the C–5 nerve root was pulled from his spinal cord;" court reasoned that "[a]lthough brachial plexus injuries sometimes occur in connection with shoulder dystocia when excessive traction is applied to the baby's head, the evidence presented in this case provided a reasonable factual basis for the trial court to find that the plaintiffs did not prove that either Dr. Javate or Shoebari was negligent in his treatment of the shoulder dystocia or that such negligence caused the brachial plexus injury.").[14]

Like the claimants in *D'Amore* and *Ford,* Taber invites us to determine which explanation for Jordan's avulsion injury is medically correct. We decline this invitation, and focus instead on application of the *Robinson* gatekeeping factors. On this record, factors (2) and (3) support the trial court's admission of the challenged opinions of Drs. Roush, Graham, and Vadasz for the jury's consideration.

### 3. General acceptance

■ Relying on a characterization during Dr. Graham's testimony of the natural forces of labor theory as a "hypothesis," Tabor invokes factor (5) to argue that this theory has not been generally accepted as a potential cause of brachial plexus injuries during birth.

Labeling the natural forces of labor theory as a "hypothesis" is not dispositive because this characterization by itself does not answer the reliability question. If the "hypothesis" is supported by reliable data and methodology, and proffered in conformity with existing standards governing admission of expert testimony, then it is admissible. *See Ford,* 220 P.3d at 945 (citing *D'Amore,* 2008 WL 852791, at *6–*7, and *Luster,* 205 P.3d at 414–15).

Similarly, the reliability issue is not resolved by pointing to a characterization of the natural forces of labor theory as "not the most commonly accepted at all" by Dr. Nath, one of Jordan's treating physicians. Dr. Nath went on to state: "The obstetric literature recently has discussed things like the child being pushed from behind by expulsive forces and then the brachial plexus being pushed up against the bone of the pubis and that would be what caused the injury. That's where the obstetric literature seems to be going." In response to a question asking whether this body of medical literature is "based on well-reasoned medical principles," Dr. Nath responded: "[T]he standard that we typically apply for any study is that it's peer reviewed, and—and I think those have been in peer-reviewed literature." According to Dr. Graham, obstetricians have not come to a consensus as to the causes of brachial plexus injuries and the issue is still under discussion.

In light of this evidence, the "general acceptance" factor does not foreclose admission of the challenged expert testimony.

### 4. Nonjudicial uses

■ Lastly, Taber invokes factor (6) by emphasizing testimony in which Dr.

---

exclusion of expert testimony when it concluded that the causation testimony of two medical experts was reliable and therefore admissible and reversed the trial court's exclusion of that testimony."

14. Like Ohio, Louisiana also looks to the *Daubert* factors in determining admissibility of expert scientific testimony. *See Cheairs v. State,* 861 So.2d 536, 541–42 (La.2003).

Graham agreed with an assertion by Taber's counsel that one goal of the American College of Obstetricians and Gynecologists "is to write articles to defend lawsuits." This testimony is not dispositive in light of (1) other goals of ACOG discussed at trial, including the provision of guidance to practitioners; and (2) the peer-reviewed nature of articles appearing in ACOG's publication Obstetrics and Gynecology. Even if extra and unwarranted emphasis is placed upon this particular snippet of testimony, it pertains at most to ACOG's publication; it has no bearing on articles appearing in a competing peer-reviewed publication, the American Journal of Obstetrics and Gynecology, including Dr. Gherman's 1999 caesarian section article discussed during Dr. Bloom's testimony. It also has no bearing on other peer-reviewed publications.

### 5. Conclusion of admissibility analysis under *Robinson*

For the reasons discussed above, the challenged expert testimony regarding natural forces of labor as a potential cause of Jordan's brachial plexus injury was admissible under the *Robinson* standard. The trial court acted within its discretion when it overruled Taber's motion to exclude the challenged expert testimony. We overrule Taber's first issue.

## II. Denial of Motion for Mistrial

In her second issue, Taber contends that the trial court erred when it denied her motion for mistrial predicated on an assertedly incurable statement concerning leg drapes made by Dr. Roush during cross-examination near the end of trial. We review the trial court's denial of a motion for mistrial under an abuse of discretion standard. *Schlafly v. Schlafly,*

33 S.W.3d 863, 868 (Tex.App.-Houston [14th Dist.] 2000, pet. denied).

As noted above, the parties disputed whether drapes were used during Jordan's delivery. Drapes were discussed while Dr. Roush testified during Taber's case-in-chief. Dr. Roush testified that she uses drapes for every delivery; asserted that she used drapes for Jordan's delivery; and described the placement of those drapes. Taber and Jordan's grandmothers testified that Taber was not draped.

Dr. Roush returned to the topic of drapes when she testified during the defense's case-in-chief. She identified a line item in Taber's hospital bill listing a charge of $405.25 for a "labor and delivery kit," which also was referred to during trial as an "OB pack." At this juncture, Dr. Roush's counsel offered a labor and delivery kit in front of the jury as a demonstrative exhibit. Taber's counsel objected, arguing that the proffered demonstrative exhibit violated an order in limine requiring counsel to show demonstrative exhibits to opposing counsel first before referencing them in front of the jury.

The parties resolved this objection outside of the jury's presence by agreeing "to allow only this piece of paper describing what the contents are to be used and that we will not have any demonstrations with pulling this out and playing with it or anything like that at this time." They further agreed that Dr. Roush "can go ahead and describe . . . the way she wants to describe it using simply this piece of paper and that's it." After this agreement was reached, Taber's counsel raised the possibility of moving for a mistrial based on the proffer of the labor and delivery kit but did not do so. Counsel stated, "Well, it may be premature. It may be that we need to make a motion for mistrial with the next couple of questions."

When testimony resumed in front of the jury, Dr. Roush was asked about the piece of paper discussed during the attorneys' colloquy with the court. The paper was referred to as a "Proxima OB Pac III reorder" form. Dr. Roush testified that the contents listed on the form are the same items contained in the kit for which Taber was charged in connection with Jordan's delivery. Dr. Roush was asked, "[W]ith regard to the contents of the Exhibit 75 kit, how can you determine from your experience and practice that the contents of that kit are the same contents that were used with Lauren Taber's delivery?" Dr. Roush answered, "I have been delivering babies for ten years, over 1500 deliveries. All of these kits are the same."

Dr. Roush then described the kit's contents, which included hand towels; a surgeon's gown; an underbuttocks drape; an abdominal drape; baby blankets; ear syringes; gauze sponges; and two "leggings." Dr. Roush stated, "Those are the leggings that you place over the maternal legs to keep that area sterile." She continued, "They cover the entire leg while the patient is in stirrups." In response to further questioning, Dr. Roush stated that "[i]t goes all the way from the foot to the abdomen" and "[t]he entire leg is in the drape." She testified that her practice is to place the underbuttocks drape first, then one leg drape, then the other leg drape, then the abdominal drape.

During the subsequent cross-examination, Taber's counsel and Dr. Roush engaged in multiple exchanges regarding the "leggings." Dr. Roush described the "leggings" as "drapes." Taber's counsel disagreed with Dr. Roush and asserted that "leggings" are "like socks that you put on and pull up when mom is put into the stirrups to begin with." Dr. Roush rejected counsel's assertion and stated, "I think you are thinking about TET hose and

that's different from the leggings for this particular purpose in an OB pack." She further stated that "there were no TET hose in the OB pack."

The back-and-forth between Taber's counsel and Dr. Roush regarding leggings culminated in the following exchange, which is the basis of Taber's appellate complaint:

> Q. Now, the stirrups are in the leggings, but Lauren's legs, are they in the leggings or not?
>
> A. Lauren's legs are in the stirrups and so they are covered by the legging drapes, yes.
>
> Q. Well, the leggings aren't drapes, are they, Doctor?
>
> A. In this particular instance, they are—I wished I could show it to you. It's in the pack, but I can't. You won't let me.

Taber's counsel promptly objected to Dr. Roush's statement and moved to strike it from the record; the trial court sustained the objection and struck the statement. At the request of Taber's counsel, the trial court immediately instructed the jury as follows: "Ladies and gentlemen, please disregard the last statement of the witness for all purposes." Counsel for both sides then approached the bench, where Taber's counsel moved for a mistrial based on Dr. Roush's statement. The trial court carried the motion with the case. The trial court ultimately overruled the motion for mistrial in a written order signed after verdict.

In light of trial counsel's prompt objection and request for an instruction, and the trial court's immediate instruction to disregard, Dr. Roush's statement warrants a new trial only if it is incurable. Taber and Dr. Roush both invoke the incurable harm standard from cases addressing improper jury argument by counsel and improper

statements by the trial court to address this situation involving an improper statement by a litigant. We do the same. *See Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex.2009) ("Incurable jury argument is rare . . . because '[t]ypically, retraction of the argument or instruction from the court can cure any probable harm . . . .' ") (quoting *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex.2008) (per curiam)); *see also Living Ctrs. of Tex., Inc.*, 256 S.W.3d at 680–81 ("To prevail on a claim that improper argument was incurable, the complaining party generally must show that the argument by its nature, degree, and extent constituted such error that an instruction from the court or retraction of the argument could not remove its effects."); *Gen. Motors Corp. v. Iracheta*, 161 S.W.3d 462, 472 (Tex.2005) (applying incurable harm standard to determine whether timely objection was necessary to preserve complaint based on conduct of litigant who personally addressed all-Hispanic jury in Spanish to thank them before closing argument).

Instances of incurable statements include appeals to racial prejudice, *see Tex. Employers' Ins. Ass'n v. Haywood*, 153 Tex. 242, 266 S.W.2d 856, 858 (1954); unsupported, extreme, and personal attacks on opposing parties and witnesses, *see Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 840 (Tex.1979); and "accusing the opposing party of manipulating a witness, without evidence of witness tampering. . . ." *Living Ctrs. of Tex., Inc.*, 256 S.W.3d at 681 (citing *Howsley & Jacobs v. Kendall*, 376 S.W.2d 562, 565–66 (Tex. 1964)).

The Texas Supreme Court has cautioned that "[n]ot all personally critical comments concerning opposing counsel are incurable." *Living Ctrs. of Tex., Inc.*, 256 S.W.3d at 681. Rather, incurable statements encompass "arguments that strike

at the courts' impartiality, equality, and fairness" because they "inflict damage beyond the parties and the individual case under consideration if not corrected." *Id.* An example of such a statement occurred in *Living Centers of Texas*, in which opposing counsel compared trial counsel for Living Centers to the perpetrators of atrocities who experimented upon and purposefully killed humans during the Nazi era in Germany. *Id.* at 681–82.

Characterizing a statement as "incurable" does not end the inquiry; we also must address whether the "incurable" statement creates reversibly harmful error. *See Manon v. Solis*, 142 S.W.3d 380, 391 (Tex.App.-Houston [14th Dist.] 2004, pet. denied); *see also Reese*, 584 S.W.2d at 839–40 ("[T]he complainant must show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence.").

 We conclude that Dr. Roush's statement regarding her inability to show the labor and delivery kit to the jury is not "incurable" and does not rise to the level of reversibly harmful error warranting a new trial. This statement is an improper critical comment directed at opposing counsel at the end of a heated exchange. However, it is not one of those "rare" statements that is so inflammatory as to be "incurable." More is required to meet that criterion. *See, e.g., Living Ctrs. of Tex., Inc.*, 256 S.W.3d at 682 ("Counsel for Living Centers was entitled to urge a smaller damages amount than the plaintiffs sought without being painted as modern-day equivalents of T–4 Project operators who experimented on and purposefully killed humans."); *cf. TXI Transp. Co.*, 306 S.W.3d at 245 ("[A]ppeals to racial and ethnic prejudices, whether 'explicit and brazen' or 'veiled and subtle,' cannot be tolerated because

they undermine the very basis of our judicial process.") (citations omitted). Moreover, we cannot say that this single statement—which arose near the end a lengthy, hard-fought trial that focused primarily on a battle of the experts— "would have persuaded a juror of ordinary intelligence to reach a verdict contrary to that which he would have reached but for the [statement]." *Manon,* 142 S.W.3d at 392; *cf. TXI Transp. Co,* 306 S.W.3d at 245 (reversing judgment based in part on 35 references during trial to defendant's employee as an "illegal immigrant" and extensive testimony concerning employee's immigration status). The trial court's immediate instruction to disregard was sufficient to address any harm flowing from the offending statement, which focused on a disagreement regarding draping that had been discussed repeatedly and thoroughly in front of the jury.

The trial court acted within its discretion in denying Taber's motion for mistrial predicated on Dr. Roush's statement. Therefore, we reject Taber's second issue.

## III. Denial of Motion to Strike Venire Members

In her third issue, Taber contends that the trial court erred by denying her motion to strike venire member number five for cause.[15]

 A venire member is disqualified and a challenge for cause is warranted when there is "bias or prejudice in favor of or against a party in the case" or bias involving the litigation's subject matter. Tex. Gov't Code Ann. § 62.105(4) (Vernon 2005); *Hyundai Motor Co. v. Vasquez,* 189 S.W.3d 743, 751 (Tex.2006) (citing *Compton v. Henrie,* 364 S.W.2d 179, 182 (Tex. 1963)). Bias is "an inclination toward one side of an issue rather than to the other[.]" *Vasquez,* 189 S.W.3d at 751. Bias is not presumed. *See Murff v. Pass,* 249 S.W.3d 407, 411 (Tex.2008); *Gant v. Dumas Glass and Mirror, Inc.,* 935 S.W.2d 202, 208 (Tex.App.-Amarillo 1996, no writ). The party challenging a venire member for cause bears the burden of showing that the venire member's state of mind naturally would lead to the inference that he could not act impartially. *See Buls v. Fuselier,* 55 S.W.3d 204, 209 (Tex.App.-Texarkana 2001, no pet.).

 A venire member is disqualified as a matter of law on the basis of bias if it appears that "the state of mind of the [venire member] leads to the natural inference that [the venire member] will not or did not act with impartiality." *Vasquez,* 189 S.W.3d at 751. When a venire member's asserted bias is not established as a matter of law, determining whether the venire member is biased so as to warrant disqualification is a factual determination to be made by the trial court. *See Sullemon v. U.S. Fid. & Guar. Co.,* 734 S.W.2d 10, 15 (Tex.App.-Dallas 1987, no writ).

 We review a trial court's ruling on a challenge for cause for abuse of discretion. *Vasquez,* 189 S.W.3d at 753–54. A trial court abuses its discretion in refusing to disqualify a venire member for

---

**15.** We address only Taber's arguments regarding venire member number five. With respect to venire member number 32, Taber states in her amended opening appellate brief as follows: "Number 32, on the other hand, clearly and consistently admitted bias." Taber provides no further arguments, statements or citations regarding venire member number 32 in her amended opening appellate brief. This single assertion does not present a sufficient discussion to warrant further analysis of venire member number 32 on appeal. *See* Tex.R.App. P. 38.1(h); *Nguyen v. Kosnoski,* 93 S.W.3d 186, 188 (Tex.App.-Houston [14th Dist.] 2002, no pet.).

cause only if the record shows that the venire member was not able or willing to set aside personal beliefs to act impartially. *Buls,* 55 S.W.3d at 210. A trial court's decision overruling a challenge for cause carries with it an implied finding that bias does not exist to the degree necessary to warrant disqualification. *Id.* at 209–10. When the evidence does not conclusively establish a venire member's disqualification, we consider the evidence in the light most favorable to the trial court's ruling. *Id.* at 210.

During voir dire, venire member number five stated that he was an environmental attorney for Shell Oil Company, and that he formerly worked as a defense litigator defending insurance companies and medical malpractice suits. He also stated that he had "friends" that work at defense counsel's firm, but he did not know any of the lawyers present at voir dire.

The following exchange took place between venire member number five and Taber's counsel:

Q. So with your background in this case, do you feel like that despite your background in this case, you could be fair and impartial and good for this jury?

A. Well, I—I would like to believe that I am a fair and impartial person, and I probably understand more than most my role as a juror.

Q. Okay. So are you telling me that you believe that you would be a good juror for this case or not?

A. I would be a good juror. . . .

Later during voir dire, Taber's counsel asked the entire panel a group of questions regarding mental anguish damages. Counsel first asked, "Now, how many of you feel that no matter what the evidence is, no matter what the instructions are, you simply could not ever award money dam-

ages for mental anguish?" Venire member number five did not raise his hand. Next, counsel asked, "Now, some people think, okay, I could award money for mental anguish. I could do that, but if you want me to award money for mental anguish in a case, then you are going to have to prove it to me by more than a preponderance of the evidence. I am not going to award money for mental anguish just on more likely than not. You would have to prove it to me beyond that for me to award money for mental anguish. How many feel that way?" Venire member number five did not raise his hand. Lastly, counsel asked, "Who feels . . . that under no circumstances, no matter what the evidence is, could you ever award a million dollars or more for mental anguish in a case?" Venire member number five raised his hand in response to this question. Taber's counsel did not ask venire member number five any individual follow up questions after he raised his hand.

■ Taber contends that venire member number five "revealed himself to be disqualified as a matter of law . . . [because] Juror 5 indicated that, *no matter what the evidence,* he could not award a million dollars for mental anguish." (emphasis in original). Taber argues that by raising his hand in response to her counsel's question, venire member number five made an "explicit," and "direct, unequivocal" statement that "he could not follow that law." We disagree.

Contrary to Taber's arguments, venire member number five's response to a question about awarding $1,000,000 or more in damages for mental anguish does not establish that he "could not follow the law." The law does not require a juror to award any specific amount of damages for mental anguish. *See Saenz v. Fid. & Guar. Ins.*

*Underwriters,* 925 S.W.2d 607, 614 (Tex. 1996) ("[T]he impossibility of any exact evaluation of mental anguish requires that juries be given a measure of discretion in finding damages[.] ... [The jury] must find an amount that, in the standard language of the jury charge, 'would fairly and reasonably compensate' for the loss."). Further, by not raising his hand in response to Taber's counsel's first two questions regarding mental anguish damages, venire member number five indicated that he could award damages for mental anguish, follow the instructions of the court, and consider the evidence in determining whether an award for mental anguish damages was appropriate. He also indicated that he could award damages for mental anguish if proven by a preponderance of the evidence, as required by law.

■ Taber also argues that venire member number five was disqualified as a matter of law due to his background: "He was also a lawyer for Shell Oil and a former insurance/medmal defense lawyer who had worked on cases like this one, had friends working for the defense firm and close friends who are doctors or nurses." We disagree. Venire member number five stated that he did not know any of the attorneys participating in voir dire. Nothing in this record indicates that venire member number five's professional background or relationships with doctors and nurses would have precluded him from being a fair and impartial juror. To the contrary, the evidence indicates that venire member number five could be "fair and impartial" and "would be a good juror" in this case.

We conclude that venire member number five was not disqualified as a matter of law. Based on this record, the trial court acted within its discretion by denying Taber's challenge for cause. *See Vasquez,* 189 S.W.3d at 751.

■ In her motion for rehearing, Taber also argues that venire member number five "demonstrated a bias against out-of-state experts." Taber's counsel asked during voir dire, "[I]s there anybody that feels that since the plaintiff would have an out-of-state expert and the defense would have an in-state expert, that before you hear any of the evidence, you would have difficulty giving the same weight to an out-of-state expert as an in-state expert?" Venire member number five raised his hand in response to this question.

■ Bias is not established as a matter of law merely because venire members raise their hands in response to a general question addressed to the entire panel. *Smith v. Dean,* 232 S.W.3d 181, 191 (Tex.App.-Fort Worth 2007, pet. denied); *Sosa v. Cardenas,* 20 S.W.3d 8, 12 (Tex.App.-San Antonio 2000, no pet.). General questions usually are insufficient to satisfy the diligence required in probing the mind of a venire member with respect to a legal disqualification for bias or prejudice. *See Murff,* 249 S.W.3d at 411; *Gant,* 935 S.W.2d at 208.

At most, venire member number five indicated that he would have "difficulty" giving the same weight to an out-of-state expert as an in-state expert. He never expressed an inability to find in favor of Taber if she proved her case, or an inability to make his decision based on the evidence and the law. Venire member number five stated that he believed he was a "fair and impartial person" and "would be a good juror" in this case. Any asserted bias expressed by venire member number five towards out-of-state experts was equivocal at best, which is not grounds for disqualification. *See Cortez v. HCCI–San Antonio,* 159 S.W.3d 87, 94 (Tex.2005).

We overrule appellant's third issue.[16]

## Conclusion

We affirm the trial court's judgment.

ANDERSON, J., dissenting.

JOHN S. ANDERSON, Justice, substitute dissenting opinion.

I withdraw my dissenting opinion issued April 20, 2010, and issue the following substitute dissenting opinion in its place.

This appeal presents the question: can a medical malpractice plaintiff receive a fair hearing when the case involves a battle of the experts where the most commonly accepted cause of a brachial plexus avulsion such as that suffered by Jordan Robinson, supports the plaintiff's case, while the defendant doctor relies on a defense based on a hypothesis that is (1) anecdotal, (2) speculative, (3) has no established use outside the area of litigation, and (4) is not generally accepted in the medical community as a legitimate explanation for the cause of brachial plexus avulsions. Because the majority uncritically glosses over the actual content of appellees' medical literature, and then relies on emanations from the penumbra[1] of that literature to hold that a medical hypothesis manufac-

tured by a small number of doctors laboring to create a defense to lawsuits of this type is reliable and therefore admissible, I respectfully dissent.

FACTUAL AND PROCEDURAL BACKGROUND

Appellant was admitted to Park Plaza Hospital on the evening of October 27, 2002. Dr. Roush was consulted by telephone and she ordered that appellant's labor be induced due to pregnancy-induced hypertension. At 5:54 p.m. on October 28, 2002, Dr. Roush was notified by telephone that appellant's second stage of labor had begun as she was fully dilated. Dr. Roush instructed the nurses to have appellant begin pushing. At 7:34 p.m., Dr. Roush was called to the hospital for the delivery as appellant had started involuntarily pushing.

While not certain of the exact time of her arrival in the delivery room, Dr. Roush denied she arrived at the last minute, but instead testified she arrived about fifteen minutes before Jordan's head delivered at approximately 8:07 p.m.[2] At 8:06 p.m. there is an entry in the nurse's notes that the crown of Jordan's head was first observed. At approximately 8:07 p.m., Jordan's head delivered and there was a "tur-

---

**16.** In a single paragraph, Taber also contends that the trial court's asserted errors in denying her motion to exclude expert testimony, denying a mistrial, and denying her motion to strike venire member number five for cause led the jury to make a finding in response to Question No. 1 that is contrary to the great weight and preponderance of the evidence. Taber undertakes no independent analysis of the evidence in support of her factual sufficiency challenge to Question No. 1. Having concluded that the trial court acted within its discretion in admitting the challenged expert testimony, denying a mistrial, and denying the motion to strike venire member number five for cause, we reject her contention that errors in these rulings caused the jury to return an answer to question No. 1 that is contrary to

the great weight and preponderance of the evidence.

**1.** In 1873, Justice Oliver Wendell Holmes defined the term penumbra as describing the "gray area where logic and principle falter."

**2.** During this approximate 33 minute period of time between the telephone call and Jordan's head delivering, Dr. Roush had to (1) travel from her residence to the hospital, which she testified took anywhere from ten to twenty minutes depending on traffic, (2) make her way to the delivery room, (3) scrub in, and (4) place the various drapes which she testified she uses in every delivery and which could only be placed by her as they are sterile.

tle sign," which indicates that a shoulder dystocia has occurred.

The occurrence of a shoulder dystocia greatly increases the chance that the newborn will suffer a brachial plexus injury.[3] Shoulder dystocia is an obstetric emergency because of the potential serious consequences that may result if it is not successfully addressed. According to *Operative Obstetrics*, because shoulder dystocia is a rare occurrence, "very few graduating residents have seen or handled more than a few cases. Therefore, when presented with cases regarding shoulder dystocia, the inexperienced obstetrician may panic and become confused, exerting unacceptable and mal-directed forces upon the infant's head and thus producing permanent brachial plexus injury." *Operative Obstetrics* also reports that "the majority of brachial plexus injuries involve extraction of the child's body within 3 minutes of the delivery of the head, that is, before the end of the next uterine contraction." In addition, it has been reported in the medical literature that "a clinician's first reaction to a difficult delivery is to exert considerably larger forces than he normally would." [4]

Dr. Roush, a young obstetrician less than a year out of residency, testified she diagnosed the shoulder dystocia within ten seconds of the "turtle sign." According to an entry in the nurse's notes, Jordan's delivery was complete at 8:08 p.m., about one minute after the "turtle sign." During this short period of time between the "turtle sign" and Jordan's birth, Dr. Roush testified that she kept appellant pushing and then successfully resolved the shoulder dystocia through the application of two different maneuvers involving the use of two nurses.[5] While Dr. Roush admitted applying traction to Jordan's head after the shoulder dystocia was relieved, she denied applying excessive force to Jordan's head and neck during the delivery. However, Jordan's grandmothers, both of whom observed the birth from behind Dr. Roush, testified Dr. Roush twisted, and turned, and pulled on Jordan with such force, they thought she was going to break his neck.

It was undisputed at trial that the most commonly accepted cause of brachial plexus injuries is a physician, when presented with a shoulder dystocia, pulls excessively on the head and neck of the newborn thus stretching out and injuring the nerves.[6] According to Dr. Rahul Nath, one of Jordan's treating surgeons, the more severe the brachial plexus injury, the more likely the injury was caused by pulling. Dr.

3. The brachial plexus is a series of nerves that come out of the neck and form a network, or a mesh, that supplies the shoulder, arm, and the hand with movement, feeling, and in children, growth.

4. Allen, PhD, "Risk factors for shoulder dystocia: An Engineering Study of Clinician Applied Forces" Obstetrics & Gynecology (1991).

5. Over time, obstetricians have developed maneuvers to address a shoulder dystocia. While there is no required order in which these maneuvers must be performed, it is generally accepted that the McRoberts maneuver, which consists of two nurses remov-

ing the mother's legs from the stirrups and sharply flexing them upon the mother's abdomen, and suprapubic pressure, should be the first maneuvers attempted. Dr. Roush testified she first applied McRoberts and then suprapubic pressure. There is no record that these maneuvers were performed in the nurse's notes. However, Dr. Roush, after the delivery, and already aware that Jordan had a brachial plexus injury, wrote a delivery note stating: "moderate shoulder dystocia resolved with McRoberts and suprapubic pressure."

6. Even Dr. Roush admitted physician applied force is a known cause of this type of injury.

Nath also testified that Jordan had a quite severe brachial plexus injury.

Eventually, appellant filed suit alleging Dr. Roush breached the standard of care during her delivery of Jordan by applying excessive force to Jordan's head in response to the shoulder dystocia situation. In her defense against appellant's accusations, Dr. Roush designated experts [7] who opined that brachial plexus injuries can be caused not only by excessive force applied by the delivering physician, but also in utero by the natural forces of labor. Appellant filed a *Daubert* motion challenging the scientific reliability of these experts' opinions.[8] Appellant asserted "there is no scientific or medical evidence to support a permanent brachial plexus injury, and in particular an avulsion, in utero from the maternal forces of labor where you have an otherwise healthy baby." According to appellant, "this is an unsupportable scientific hypothesis created by [appellees] in an effort to avoid responsibility in malpractice actions." The trial court denied appellant's motion and allowed Dr. Roush and her retained experts to testify regarding the maternal forces of labor theory. Ultimately the case was submitted to the jury and they returned a verdict that Dr. Roush was not negligent in her handling of Jordan's delivery. The trial court eventually entered a take nothing judgment based on that verdict. Appellant filed a motion for new trial, which the trial court denied. This appeal followed.

### DISCUSSION

On appeal, appellant contends appellees' expert opinions are unreliable and inadmissible because they are based on controversial literature that suggests the mater-

nal forces of labor may cause some form of brachial plexus injury. More specifically, appellant argues the opinions are unreliable because (1) the literature consists primarily of anecdotal case reports and speculative hypotheses; and (2) there is an analytical gap between the type of injury described in the literature, some form of brachial plexus injury, and the specific injury at issue in this appeal, an avulsion. According to appellant, because of these flaws, the only support to be found in the record for appellees' theory that the maternal forces of labor can cause an avulsion, is the experts' *ipse dixit* that it is so. I agree.

### I. Expert Opinion Testimony and the Standard of Review

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex.2006) (quoting Tex.R. Evid. 702). Expert testimony is admissible if (1) the expert is qualified, and (2) the testimony is relevant and based on a reliable foundation. *Id.* If the expert's scientific evidence is not reliable, it is not evidence. *Id.* Courts must make a determination of reliability from all the evidence. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 720 (Tex.1997).

Expert testimony must be based on a reliable foundation of scientific or professional technique or principle. *Wiggs v. All Saints Health System*, 124 S.W.3d 407, 410 (Tex.App.-Fort Worth 2003, pet. denied)

---

7. Dr. Roush designated two experts in addition to herself: Dr. Jack Graham, a maternal fetal subspecialist, and Dr. Andrew Vadasz, a pediatric neurologist.

8. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

(citing *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex.1995)). In addition, each material part of an expert's theory must be reliable. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637 (Tex.2009). The trial court's determination that these requirements are met is reviewed for abuse of discretion. *Mendez*, 204 S.W.3d at 800. The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles. *Id.* Admission of expert testimony that does not meet the reliability requirement is an abuse of discretion. *Id.* When the expert's underlying scientific technique or principle is unreliable, the expert's opinion is no more than subjective belief or unsupported speculation and is inadmissible. *Wiggs*, 124 S.W.3d at 410. Causation opinions based on possibility, speculation, and surmise are no evidence. *Havner*, 953 S.W.2d at 711–12.

Far from the relaxed gatekeeper function suggested by the majority, the Texas Supreme Court has determined that when expert testimony is involved, courts are to *"rigorously examine the validity of facts and assumptions on which the testimony is based,* as well as the principles, research, and methodology underlying the expert's conclusions and the manner in which the principles and methodologies are applied by the expert to reach the conclusions."[9] *Whirlpool Corp.*, 298 S.W.3d at 637 (emphasis added). According to the Texas Supreme Court, an expert's opinion might be unreliable, for example, if it is based on assumed facts that vary from the actual facts, or it might be conclusory because it is based on tests or data that do not support the conclusions reached. *Id.*

A reviewing court is not required to ignore gaps in an expert's analysis or assertions that are simply incorrect. *Mendez*, 204 S.W.3d at 800. Further, the Supreme Court made it clear that a trial court is not required to admit evidence which is connected to existing data only by the *ipse dixit* of the expert. *Id.* Indeed, an expert's bald assurance of validity is not enough. *Havner*, 953 S.W.2d at 712. Instead, the underlying data should be independently evaluated in determining if the opinion itself is reliable. *Id.* at 713.

## II. Were the Challenged Expert Opinions Reliable?

It was undisputed at trial that the most commonly accepted cause of brachial plexus injuries is excessive traction by the delivering physician on the head and neck of the newborn. Despite this, citing a series of articles, case reports, summaries of medical literature, and excerpts from medical textbooks, written by a small number of obstetricians, appellees' experts each opined they believed Jordan's avulsion was the result of either an in utero event or was caused by the natural forces of labor.[10] Therefore, I begin with an examination of the literature appellees' experts relied on in the formation of their opinions.

### A. Appellees' medical literature.

1. Gary Cunningham et al., *Williams Obstetrics* 460 (21st ed.2001).

---

9. It is for this reason that I do not find the out of state cases cited by the majority persuasive. Unlike the majority, I do not believe the cited opinions make it clear that Colorado and Louisiana impose the same strenuous gatekeeper function on the trial judge that the Texas Supreme Court has imposed on Texas trial judges.

10. The primary authors of the literature appellees' experts relied on include: Dr. Robert B. Gherman, Dr. Joseph G. Ouzounian, Dr. Bernard Gonik, Dr. Raymond J. Jennet, Dr. Herbert F. Sandmire and Dr. Robert K. DeMott.

All testifying experts, including Dr. Roush, agreed the medical textbook, *Williams Obstetrics*, is a reliable source and is widely used in obstetrics and medical schools. It concludes, "brachial plexus injury usually results from downward traction on the brachial plexus during delivery of the anterior shoulder."

Appellees attached Chapter 19 *Dystocia* as an exhibit to their *Daubert* motion response:

> BRACHIAL PLEXUS INJURY. Injury to the brachial plexus may be localized to the upper or lower part of the plexus. It usually results from downward traction on the brachial plexus during delivery of the anterior shoulder. *Erb palsy* results from injury to the spinal nerves C5–6 and sometimes C7. It consists of a paralysis of shoulder and arm muscles resulting in a hanging upper arm that may be extended at the elbow. Involvement of the lower spinal nerves ... always includes injury of the upper nerves and results in a palsy including the hand, which can cause a clawhand deformity. Hardy (1981) studied the prognosis of 36 infants with brachial plexus injuries. Interestingly, shoulder dystocia had been reported in only 10 of these, and two had been delivered abdominally. Nearly 80 percent of these children had complete recovery by 13 months, and none with residual defects had severe sensory or motor deficits in the hand. Jennet and associates (1992) and Gherman and colleagues (1999) have presented evidence that brachial plexus injuries may precede the delivery itself and may occur even prior to labor.

2. Robert B. Gherman et al., *Brachial Plexus Associated with Caesarian Section & In Utero Injury,* Am. J. Obstetrics & Gynecology (1999).

During trial, experts for both sides were questioned about this article, however, the article itself is not found in the appellate record. The majority places great emphasis on this article in reaching the conclusion that appellees' experts' opinions were reliable. However, according to Dr. Bloom, appellant's obstetrician expert, the article reports six cases of permanent brachial plexus injury following caesarian section; the unique features of which make them distinguishable and therefore inapposite to Jordan Robinson's case. *See Whirlpool Corp.,* 298 S.W.3d at 637.

3. Robert G. Gherman et al., *Spontaneous Vaginal Delivery: A Risk Factor for Erb's Palsy?,* 178 Am. J. Obstetrics & Gynecology, 423 (1998).

This article, a retrospective study of hospital records, again with Dr. Gherman as the primary author, was attached to appellees' *Daubert* Response. In the article, Dr. Gherman noted that even though permanent brachial plexus injuries represent only one to five percent of total brachial plexus injuries, they "are the source of almost all litigation related to shoulder dystocia."

According to Dr. Gherman, "recent literature supports the hypothesis that some cases of brachial plexus palsy may have an intrauterine origin." In the comment section, the authors wrote: "our data, taken together with the preceding reports, provide several lines of evidence to show that not all Erb's palsies [11] are traction related.

---

**11.** Injury to the brachial plexus can result in paralysis of the muscles of the upper extremity. Its incidence is approximately 1.6 per 1,000 births. Three forms of injury have been recognized: Duchenne–Erb's palsy, involving the upper arm, due to trauma to the fifth through the seventh cervical nerve roots; Klumpke's palsy, involving the lower arm, due to injury of the eighth cervical and first

Rather, an in utero insult perhaps combined with a susceptibility to pressure to traction may be etiologic." The authors went on to "acknowledge that among the cases of Erb's palsy occurring without shoulder dystocia, there may have been instances of nonrecognition or incomplete documentation of a difficult delivery. Concern over medicolegal implications, however, would probably have led to an overdocumentation [sic] of maneuvers." They went on to conclude:

Brachial plexus injury occurring without shoulder dystocia is a distinct, real entity worthy of further study. Many permanent brachial plexus injuries may be due to in utero forces that precede the actual delivery. Before the recognition of the shoulder dystocia, a significant degree of stretch or pressure may have already been applied to the brachial plexus. Moreover, even when a brachial plexus injury is associated with shoulder dystocia, it may have occurred independent of traction applied by the obstetrician. In addition, attempts to predict those babies at risk for permanent brachial plexus injury appear to be medically and economically unsound.

According to Dr. Graham, one of appellees' retained experts, this is an article hypothesizing that the propulsive nature of delivery is a possible cause of brachial plexus injuries.

Emphasizing a problem Dr. Gherman himself recognized within the article, a Dr. Spellacy, in a letter to the journal editor, challenged the reliability of Dr. Gherman's conclusions:

Another explanation for their results is very possible. What if the operator experienced a shoulder dystocia and managed it by hard traction on the infant's neck to achieve delivery? In a retro-

spective review of hospital charts that type of case would not be classified as "shoulder dystocia" in this study because no other maneuvers were performed. The excessive neck traction could result in more fractures and permanent Erb's palsy than occurs in infants who were managed by applying classic shoulder dystocia maneuvers.

Dr. Spellacy concluded by writing "although the authors have attempted to further understand the etiology of Erb's palsy, these retrospective data do not do that."

4. Robert B. Gherman et al., *Brachial Plexus Palsy: An in Utero Injury?*, 180 Am. J. Obstetrics & Gynecology 1303 (1999).

In an article similar to the one discussed above, Dr. Gherman wrote:

The incidence of permanent brachial plexus injury after shoulder dystocia is 1.6%. However, it accounts for almost all the shoulder dystocia-related litigation. Historic obstetric teachings have stated that brachial plexus injuries result from excessive traction and flexion exerted on the infant's neck during delivery, thereby tearing or avulsing the cervical nerve roots from the spinal cord. In *contrast, many recent reports* have suggested that a significant proportion of brachial plexus injuries may be in utero phenomena. Our purpose is to review the literature supporting the concept that many cases of permanent brachial plexus palsy may be unavoidable, unpredictable in utero injuries that occur without relation to traction and in the absence of historic risk factors."

By the author's own admission, this article examined only the literature that supported the hypothesis that permanent brachial plexus injuries "may be unavoidable,

thoracic roots; and complete paralysis of the upper extremity.

unpredictable in utero injuries that occur without relation to traction and in the absence of historic risk factors." In addition, in the comment portion of the article, Dr. Gherman admitted "we acknowledge that almost all the information concerning the relationship between delivery, shoulder dystocia, and brachial plexus injury has been collected retrospectively and therefore has inherent ascertainment bias." Dr. Gherman concluded the article with this plea: "because there is no currently accepted method to objectively quantify 'excessive' lateral traction, the mere occurrence of brachial plexus injury should not therefore be taken as prima facie evidence of medical negligence."

Robert H. Allen, Ph.D., wrote a letter to the editor of the journal criticizing Dr. Gherman's conclusions. Allen wrote: "because underreporting of difficult deliveries is an acknowledged problem in labor management, reappraisal should focus more on objectively defining, properly managing, and fully documenting shoulder dystocia. This would do more to mitigate preventable brachial plexus injuries than any study of intrauterine force effects."

In response to Allen's letter, Dr. Gherman wrote: "The goal of our review article was to suggest that some cases of brachial plexus injury may be of intrauterine origin." In that same response, Dr. Gherman agreed "that a 'stretch' injury is the most likely mechanism of brachial plexus injury, compression of the brachial plexus by the symphasis pubis or uterine anomalies may also be euologic." Curiously, in that same response, Dr. Gherman attacked Allen's own research and conclusions regarding the level of force applied during delivery: "we therefore question the scientific validity of making wide-ranging inferences from this single case of brachial plexus injury." The same could be said

about Dr. Gherman's own writings on this subject.

5. Robert B. Gherman et al., *Shoulder Dystocia: The Unpreventable Obstetric Emergency with Empiric Management Guidelines*, 195 Am. J. Obstetrics & Gynecology 657 (2006).

In this article the authors sought to "answer, in an evidence-based format, the following questions: (1) Is shoulder dystocia predictable?; (2) Can shoulder dystocia be prevented?; (3) When shoulder dystocia does occur, what maneuvers should be performed?; and (4) What are the sequelae of shoulder dystocia?"

They concluded that "further research into the correlation between fetal acidemia in shoulder dystocia is required with a larger number of patients so that an evidence-based time frame for shoulder dystocia alleviation can be developed." They also called for "the commercial development of a shoulder dystocia simulator that will not only allow healthcare providers to practice the obstetric maneuvers but will also enable the generation of a set of nonempiric guidelines."

6. Joseph G. Ouzounian et al., *Permanent Erb's Palsy: A Lack of a Relationship with Obstetrical Risk Factors*, 15 Am. J. Perinatology 221 (1998).

The purpose of this retrospective study was to describe the antepartum and intrapartum characteristics of a group of children with permanent brachial plexus injuries in an effort to determine whether the historic obstetric risk factors associated with permanent brachial plexus injuries were present. The authors concluded that the results of prior studies, in conjunction with the results of the present study, "suggest that the brachial plexus injury may result from in utero events or the normal delivery process and not from traction applied at delivery."

7. Bernard Gonik et al., *Mathematic Modeling of Forces Associated with Shoulder Dystocia: A Comparison of Endogenous and Exogenous Sources,* 182 Am. J. Obstetrics & Gynecology 689 (2000).

Beginning with the premise that the forces associated with the birth process had been studied in only a limited fashion, the authors of this article attempted to develop a simple mathematical model to predict the contact "between the symphysis pubis and the base of the fetal neck."

The authors then generated a large number of mathematical formulas based on speculative conclusions and suppositions.[12] Following this, they then admitted: "obviously, the mathematic exercise presented here can only crudely examine this complex issue of forces and pressures related to the shoulder dystocia event." Finally, the authors suggested that "more scientific studies are needed to examine detailed aspects of the mechanics of brachial plexus trauma in this specific setting to better define the factors leading to injury."

8. Bernard Gonik et al., *Prediction of Brachial Plexus Stretching During Shoulder Dystocia Using a Computer Simulation Model,* 189 Am. J. Obstetrics & Gynecology 1168 (2003).

Citing his own previous articles as the supporting research, Dr. Gonik designed another study to test the hypothesis that both endogenously (maternal expulsion) and exogenously (clinician traction) applied forces can result in brachial plexus stretching in the anterior presenting fetal shoulder. In this study, the "fetal model was developed by using a 9 month-old child crash test dummy model, downscaled to estimate 90th percentile parameters for a newborn infant." Then, "the left-sided (anterior facing) brachial plexus was simulated by using a spring element." "The mechanical properties of the nerve element were based on experimental data performed on rabbit tibial nerves and were represented with a bilinear function." Finally, "the maternal pelvis was built according to the 50th percentile dimensions of a female bony pelvic model. This multibody model consisted of 14 ellipsoids."

Having gone through this exercise, the authors concluded with this caveat: "because there are no currently established thresholds for brachial plexus nerve disruption in the fetus, *the results of our experiments cannot be directly applied to the clinical arena.*" (emphasis added).

9. Herbert F. Sandmire & Robert K. DeMott, *Erb's Palsy Causation Iatrogenic or Resulting from Labor Forces?,* 50 J. Reprod. Med. 563 (2005).

This article is a review of the literature addressing the causes of brachial plexus injuries. In the conclusion section, the authors wrote: "The research by Allen

---

12. A representative sampling of the development of the authors' formulas:

The endogenous force was estimated according to the model of a piston (infant) within a thin-walled pressure vessel (uterus). The expulsive force on the piston ($F_{piston}$) was then defined as follows: $F_{piston} = P_{chamber} [x] A_{piston}$ where $P_{chamber}$ is the pressure developed within the vessel and $A_{piston}$ is the cross-sectional area of the moving structure. For the case of childbirth $P_{chamber}$ can be assumed to be the intrauterine pressure generated by uterine contraction and maternal bearing down and $A_{piston}$

represents the cross-sectional area of the infant's body within the uterus. Because of the difficulty of determining this area as a result of the unknown arrangement of the torso and limbs within the uterus and the variable and complex geometry, the piston area was estimated as the mid-transverse cross-sectional area as an ellipsoid and the cross-sectional area in the mid-transverse plane was calculated from the following equation: $A_{uterus} = \Pi D[x] d/4$ where D and d are the lengths of the major and minor axes of the elliptic cross-section, respectively.

and coauthors has the potential for producing significant information that could be useful to obstetricians." The article calls for more research and ends with the hope that the "myth that brachial plexus palsy results from clinician-applied excess traction will hopefully be dispelled."

**10.** Herbert F. Sandmire & Robert K. DeMott, *Erb's Palsy: Concepts of Causation,* 95 Am. C. Obstetrics & Gynecology 941 (2000).

In a brief article that appellees' own expert Dr. Graham called an editorial, the authors wrote:

> What is the basis for the belief that Erb's palsy is caused by the birth attendant pulling too hard on the baby's head? Does it explain all cases or even some of the cases? How do those who assert that excessive lateral traction is the cause know that excessive lateral traction actually occurred? Is it not time to stop blaming the birth attendant for most of the Erb's palsy cases? The indirect evidence presented here supports the propulsive nature of the stretching of the nerves involved.

**11.** H.F. Sandmire & R.K. DeMott, *Erb's Palsy Without Shoulder Dystocia,* Int'l J. Gynecology & Obstetrics 253 (2002).

This article was a review of "certain articles which have provided evidence that Erb's palsy can occur without associated shoulder dystocia." Most prominent of these studies were those published by Gherman. In the results section, Sandmire and DeMott wrote that "the most probable cause of Erb's palsy, both with and without shoulder dystocia is the maternal propulsive forces."

**12.** Herbert F. Sandmire & Robert K. DeMott, *Erb's Palsy Causation: A Historical Perspective,* 29 Birth 52 (2002).

**13.** Appellant's second stage of labor was ap-

This study, consists of a review of certain historical literature in the field, particularly studies with an ultrashort second stage of labor (less than fifteen minutes), which reported brachial plexus injuries.[13] While admitting it is still commonly accepted in the medical literature that brachial plexus injuries are caused by clinician-applied excessive lateral traction on the fetal head and neck, the authors hypothesize that "it is now time to suggest that all of the preceding indirect evidence establishes the maternal propulsive forces as the most likely cause of Erb's palsy."

**13.** Israel Alfonso et al., *Intrauterine Shoulder Weakness and Obstetric Brachial Plexus Palsy,* 31 Pediatric Neurology 225 (2004).

This case report described a 3–day–old male delivered by uncomplicated caesarian section with right obstetrical brachial plexus palsy and congenital arm atrophy. The patient had a history of decreased right arm movement that had been detected by fetal ultrasound at 18 to 20 weeks of gestation. According to the authors, the purpose of the case report was to suggest that stretching of brachial plexus at birth sufficient to produce plexus injury may occur in a patient with a vulnerable plexus even in the absence of traction during delivery.

**14.** Robert H. Allen & Edith D. Gurewitsch, *Temporary Erb–Duchenne Palsy Without Shoulder Dystocia or Traction to the Fetal Head,* 105 Am. J. Obstetrics & Gynecology 1210 (2005).

In this case report, the baby's birth was videotaped by the father. After a thirty minute second stage of labor, the birth was unattended (i.e., it was induced and then the doctor had minimal involvement with the actual delivery). The baby suffered a temporary brachial plexus injury to the

proximately two hours.

posterior shoulder/arm that had completely resolved four days after birth.

In the Comment portion of the case report, Dr. Allen wrote:

Controversy exists as to the frequency and degree of brachial plexus impairment with neither strong traction nor in utero abnormality. This debate is largely based on interpretation of findings from retrospective studies, where neonatal records coded for brachial plexus palsy are matched to corresponding maternal records coded for shoulder dystocia. When injuries occur without evidence of shoulder dystocia, one view is that the maternal complication must not have been recognized or coded; the other view is that the injury must have occurred naturally. A confounding issue in these types of studies is how strictly shoulder dystocia or Erb–Duchenne palsy or both are diagnosed and coded. Both are subjective diagnoses and rates vary widely; for example, shoulder dystocia incidences vary from less than 0.2% to more than 4%. Some studies find that, among vaginal cephalic births, all injured neonates are associated with shoulder dystocia deliveries. Others find brachial plexus impairments in average—weight or even small for gestational age neonates, whose deliveries are unlikely to have been complicated by shoulder dystocia.

. . .

Although precise causation cannot be determined, the most biologically plausible explanations for temporary injury unrelated to clinician traction must consider the physical properties of the brachial plexus and its surrounding tissue, in utero positioning, and the mechanical forces of labor. . . . The nerves and surrounding tissue of the brachial plexus have considerable biologic variation, and muscle tone can vary with fetal well-being. Therefore, some fetuses may be more predisposed to brachial plexus injury than others. These phenomena may have contributed to temporary impairment in this case. . . . Additional prospective study and research is certainly warranted to answer this question more specifically.

**15.** Ernest M. Graham et al., *A Retrospective Analysis of Erb's Palsy Cases and Their Relation to Birth Weight and Trauma at Delivery,* 6 J. Maternal–Fetal Med. 1 (1997).

This article is a retrospective examination of all live births at the Hospital of the University of Pennsylvania from January 1, 1987 to June 20, 1991. The authors recognized that conventional medical wisdom in obstetrics has held that the great majority of brachial plexus injuries are due to recognizable birth trauma occurring in macrosomic fetuses. They also recognized that shoulder dystocia may be underreported in the obstetric literature, and unrecognized shoulder dystocia may be associated with an increased risk of neonatal injury. They went on to state that some investigators have noted cases of brachial plexus impairment occurring in normal-sized infants delivered by cesarean section without any reported birth trauma. The authors then stated that the appearance of Erb's palsy in the newborn may not be as closely linked to birth weight and recognizable birth trauma as has previously been thought. The authors concluded the article by stating "this has significant medical and medicolegal implications."

**16.** David Peleg et al., *Fractured Clavicle and Erb's Palsy Unrelated to Birth Trauma,* 177 Am. J. Obstetrics & Gynecology 1038 (1997).

In yet another retrospective study, the authors began with the premise that "strong downward traction of the head in an attempt to deliver the anterior shoulder

is thought to be the etiology of Erb's palsy and some clavicular fractures." They also recognized that shoulder dystocia is underreported in the hospital records. Despite this, they went on to speculate that "even allowing for underreporting and differences in delivery technique, at least some of these fractures and Erb's palsies were completely idiopathic." They conclude "it may be that the forces of labor, maternal pelvic anatomy, and fetal position interact in such a way to make certain fetuses more susceptible to spontaneous birth trauma." Finally, the authors conclude the article with a plea: "the question remains whether anyone can be held responsible for those birth injuries that occur in seemingly normal labor and deliveries."

**17.** Gary D.V. Hankins et al., *Brachial Plexus Palsy Involving the Posterior Shoulder at Spontaneous Vaginal Delivery,* 12 Am. J. Perinatology 55 (1995).

This is a case report in which "the infant was discharged at approximately 48 hours of life, having some minor movement of the fingers noted prior to discharge."

Based entirely on the information found in the hospital record, the authors suggested that "some brachial plexus injuries may be completely unrelated to manipulations performed at the time of delivery. In these cases it is most likely that maternal expulsive forces of delivery may be partly or totally responsible for posterior or anterior arm injuries." The authors reported that "the degree of shoulder dystocia was described as minimal and delivery was effected with the use of the McRobert's maneuver combined with tractive forces that were described as equivalent to those exerted on the head with any vaginal delivery."

**18.** Malcolm I. Levene et al., *Fetal and Neonatal Neurology and Neurosurgery,* (3rd ed.2001).

The authors recognized there is a hypothesis that brachial plexus injury can occur in the absence of shoulder dystocia and that there may be an intrapartum cause, possibly pressure of the shoulder against the sacral promontory, or symphasis pubis.

**19.** Raymond J. Jennett et al., *Erb's Palsy Contrasted with Klumpke's and Total Palsy: Different Mechanisms are Involved,* 186 Am. J. Obstetrics & Gynecology 1216 (2002).

This article consists of a review of some of the literature examining brachial plexus injuries with a special emphasis on articles written by Dr. Gherman and Dr. Ouzounian. It also examined six case reports detailing brachial plexus injuries to the posterior arm of the newborn. Dr. Jennett postulated that the brachial plexus injuries were not the product of excessive traction by the physician, but instead that "the irregular contour of the posterior pelvis compared with the usual regular and smooth plane of the anterior uterine wall could make it more likely that the posterior arm might assume or be forced into an abnormal position."

In a response to a letter to the editor asking a question about their article, the authors wrote: " . . . these conditions are caused by tears in the dura, with the incomplete or complete avulsion of the nerves and therefore, if our conjectures or hypotheses are correct, had to have occurred at the time that the anterior arm was backward rotated, abducted, or placed in other abnormal positions."

**20.** Adam Romoff, *Shoulder Dystocia: Lessons From the Past and Emerging Concepts,* 43 Clinical Obstetrics & Gynecology 226 (2000).

Because of increasing obstetric concern over the perceived increase in the number

of shoulder dystocias in the face of increasing birth weights, in this article, Dr. Romoff sought to introduce a new, more objective definition of when a shoulder dystocia occurs.

In the process of developing this new definition, Dr. Romoff noted that "nature itself may apply inappropriate force, such as may occur in precipitous labor, wholly unaided by the unfortunate obstetrician in attendance. Jennett et al. reported that 54% of brachial plexus injuries were not associated with clinically detectable shoulder dystocia. They postulated that uterine maladaptation and inappropriate intrauterine forces may have played an intrapartum or even antepartum role."[14]

21. Pamela D. Berens, Richard L. Berkowitz & Brian C. Brost, *Precis: An Update In Obstetrics & Gynecology*, Am. C. Obstetricians & Gynecologists (2nd ed.2000).

This update for practitioners contains a section on shoulder dystocia, which it defines "as the inability to deliver an infant using routine obstetric maneuvers, after delivery of the fetal head, due to an arrest of the forecoming shoulder behind the maternal symphysis pubis."

The guide then instructed practitioners that "when shoulder dystocia is diagnosed, the patient should be instructed to cease pushing while attempts are made to relieve the obstruction. A deliberate and planned sequence of events should follow, including the recruitment of obstetric assistance and the notification of anesthesia and pediatric support services."

While recognizing that brachial plexus injuries have been reported to occur with breech deliveries and during otherwise uncomplicated cephalic-presenting vaginal and cesarean deliveries, the update recognized that as for the cause of those injuries, "the pathophysiologic mechanism by which brachial plexus injury occurs has been greatly debated."

22. Gary D.V. Hankins et al., *Operative Obstetrics*, (1995).

Appellees attached a small excerpt from *Operative Obstetrics* to their *Daubert* response. The textbook excerpt mentioned that "not all cases of brachial plexus palsy occur during the intrapartum period, but may be secondary to antepartum intrauterine events." It then quoted from the American College of Obstetricians and Gynecologists Technical Bulletin No. 159 (1991b):

> It is not always possible to deliver an undamaged infant after shoulder dystocia has been encountered. Even when shoulder dystocia is managed optimally, brachial plexus injuries may occur. Some of these injuries may be associated with the process of impaction at the symphysis or during descent of the shoulders into the pelvis.

**B. The expert opinions are not based on a reliable foundation.**

I turn now to whether appellees' experts based their opinion that natural forces of labor may have caused Jordan Robinson's avulsion is based on a reliable foundation.

If a medical expert seeks to support his or her opinion on causation with medical literature, that opinion must be based on a "broad reading of the medical literature." *Wiggs*, 124 S.W.3d at 410 (quoting *Minn. Min. & Mfg. Co. v. Atterbury*, 978 S.W.2d 183, 193 (Tex.App.-Texarkana 1998, pet. denied)). "Broad reading of the medical literature" means that the expert must "point to specific passages in varied and different sources that are generally accept-

---

14. Ultimately, Dr. Romoff concluded that the best definition would be a neck-to-completion interval of more than 60 seconds or the use of ancillary maneuvers to effect delivery.

ed as support for his conclusion." *Id.* Here, appellees failed to meet this requirement.

Initially, appellees' experts did not base their opinion that the natural forces of labor can be a possible cause of brachial plexus injuries on a broad reading of the medical literature. Instead, the experts relied on a relatively small number of articles written by a few authors, each of whom based their conclusions, in part, on the writings of the other members of that small group. In addition, an examination of the literature cited by appellees reveals exactly how limited it is. Much of the literature consists of reviews and summaries of a limited number of articles advocating the natural forces of labor hypothesis. In addition, while appellees have attempted to broaden the basis of their natural forces of labor opinion by arguing medical textbooks have adopted it, I disagree. Instead, the textbooks have, at best, mentioned the existence of the natural forces of labor concept. None of the textbooks found in the appellate record have endorsed the natural forces of labor hypothesis as a generally accepted method explaining how brachial plexus injuries, much less avulsions, are caused. This lack of adoption by medical textbooks was confirmed by Dr. DeMott, one of the chief proponents of the natural forces of labor hypothesis, when he testified in a 2004 deposition only that medical textbooks "recognize our writings in this field."

There are also limitations to the cited articles because many of them involve retrospective studies. Dr. Graham testified about the problems associated with retrospective studies of hospital records. According to Dr. Graham, the most scientific type of medical research is Level 1 Research, which is a prospective, randomized clinical trial. Dr. Graham also testified that retrospective studies of hospital rec-

ords are considered a lower category of medical research. According to Dr. Graham, a retrospective study is placed in this lower category because, when looking at hospital records, the researcher is at the mercy of whoever was writing the record and therefore the study is subject to an inherent ascertainment bias. This is a particular problem when conducting research in the area of shoulder dystocias and brachial plexus injuries because it is widely believed the incidence of shoulder dystocia, because of the subjective nature of the diagnosis, is underreported in the medical records. Dr. Allen addressed how this underreporting impacts medical research. According to Dr. Allen, the lack of a shoulder dystocia notation in a medical record can lead one researcher to conclude it is just another example of underreporting, while another concludes it is evidence of an intrauterine cause of brachial plexus injuries.

The majority cavalierly discounts the retrospective nature of the studies by noting the absence of the preferred prospective studies can be explained away by the potential ethical issues involved in carrying out a prospective study. It then concludes that reliance on retrospective studies and the potential for ascertainment bias do not alone warrant exclusion of the disputed expert testimony but instead should be addressed through cross-examination. In reaching this conclusion, the majority overlooks the fact that the Texas Supreme Court has called for courts to examine the entire record and to *"rigorously examine the validity of facts and assumptions on which the testimony is based,* as well as the principles, research, and methodology underlying the expert's conclusions and the manner in which the principles and methodologies are applied by the expert to reach the conclusions." *Whirlpool Corp.,* 298 S.W.3d at 637 (emphasis added). The majority also ignores the Texas Supreme

Court's fiat that each material part of an expert's theory must be reliable. *Id.*

Another problem with appellees' defense theory is, as Dr. DeMott's deposition testimony revealed, there is no way to prove or disprove the natural forces of labor hypothesis because it would be unethical to conduct that kind of study. In addition, Dr. DeMott admitted there is a potential for error rate but there is no medical literature testing that rate. Finally, Dr. Graham testified during trial, and Dr. Sandmire testified during a deposition, that they did not consider any of the literature behind appellees' natural forces of labor defense to be reliable in a legal sense.

As touched on above, appellees also failed to demonstrate that the medical community has generally accepted the natural forces of labor concept. Dr. Graham, appellees' own expert, testified that, under the scientific method, researchers begin with a hypothesis, then develop a theory, and once the researchers establish the theory, that theory is tested and only then do you get to where you have an accepted scientific fact. Basic to the scientific method is the premise that the conclusions reached are the result of analysis. *Quiroz ex rel. Quiroz v. Covenant Health Sys.*, 234 S.W.3d 74, 89 (Tex.App.-El Paso 2007, pet. denied). Coming to a firm conclusion first and then doing research to support that conclusion is the antithesis of the scientific method. *Id.* Here, appellees' experts relied on numerous articles that began with the conclusion that the maternal forces of labor can cause a brachial plexus injury and then did research, usually by simply excluding contrary studies, which supported the desired conclusion. By failing to critically examine the medical literature underpinning appellees' experts' opinions, the majority glosses over this fact.

According to Dr. Graham, the idea that the maternal forces of labor can cause a brachial plexus injury remains a scientific hypothesis. In addition, many of the sources and authors cited by appellees in support of their causation opinion confirm that the idea that the natural forces of labor can cause brachial plexus injuries remains a hypothesis. These include the textbook *Operative Obstetrics* ("This concept had to be discarded when a pertinent study showed that neuromuscular deficits develop much faster in fetal than in adult pigs. An alternative hypothesis, namely that brachial plexus injury is frequently caused during the labor process by uterine forces, still prevails. However, since the maternal forces mobilized during labor and delivery are expulsive in nature, it is difficult to perceive a natural mechanism which could imitate the effect of traction injuries."), Dr. Gherman ("recent literature supports the hypothesis that some cases of brachial plexus palsy may have an intrauterine origin"), Dr. Jennett ("... these conditions are caused by tears in the dura, with the incomplete or complete avulsion of the nerves and therefore, if our conjectures or hypotheses are correct, had to have occurred at the time that the anterior arm was backward rotated, abducted, or placed in other abnormal positions."), and Dr. Gonik ("The study was designed to test the hypothesis that both [the natural forces of labor and clinician extraction] can result in brachial plexus stretching in the anteriorly presenting fetal shoulder."). The majority explains away this problem by stating the decision on whether to admit or exclude an expert's opinion should not be resolved simply on the author's choice of words. However, word choice, particularly in the realm of medical literature, is important. Here, the authors and witnesses are doctors familiar with the scientific method and the significant difference between a hypothesis and an accept-

ed scientific fact. In addition, deciding the experts' opinions are unreliable would not be based simply on semantics because an examination of the content of the articles and the witnesses' testimony reveals their use of the word hypothesis was not mere literary license but instead was based on the inescapable conclusion that the substance of the challenged experts' opinions, that the maternal forces of labor may cause a brachial plexus injury, has not gained widespread acceptance in the medical community and remains only a hypothesis. *See Marvelli v. Alston*, 100 S.W.3d 460, 470 (Tex.App.-Fort Worth 2003, pet. denied) ("Whether expert testimony on causal connection rests upon reasonable medical probability must be determined by the substance and context of the testimony rather than semantics or use of a particular term or phrase").

The controversial nature of the natural forces of labor hypothesis was also confirmed by Dr. Nath, one of Jordan Robinson's treating physicians. Dr. Nath testified that the idea that the natural forces of labor could potentially cause a brachial plexus injury had only recently appeared in the medical literature and it is not commonly accepted at all.

The foundation of the challenged expert opinions is also unreliable because there is a significant analytical gap between the natural forces of labor hypothesis and the injury actually suffered by Jordan Robinson, an avulsion. While there may be medical literature suggesting that the natural forces of labor may be a potential cause of brachial plexus injuries, none of appellees' experts could point to a single article in the medical literature reporting that an avulsion can be an in utero injury or the result of the spontaneous forces of labor. The absence of such an article was further confirmed by deposition testimony of both Dr. DeMott and Dr. Gherman who testified they were not aware of any articles in the medical literature that shows an avulsion was caused by the natural forces of labor. Both Dr. Roush and Dr. Graham testified there is no medical literature that proves anything other than excessive lateral traction by the clinician causes a brachial plexus avulsion. Finally, the articles cited by appellees' experts are distinguishable because they address labor and other issues not present in the birth of Jordan Robinson. These include an ultrashort second stage of labor, caesarian section, maternal fibroids or other uterine abnormalities, facial palsy, and problems with the long term positioning of the fetus within the womb.

Finally, an additional factor to consider is that, after reviewing appellees' literature, I believe that much of it was motivated in no small part by concerns over the amount of litigation involving brachial plexus injuries and the lack of a viable defensive theory in the face of the only generally accepted cause of those injuries: excessive traction by the delivering physician. Many of the articles cited by appellees' experts mention litigation. In addition, Dr. Graham admitted that one of the goals of the American College of Obstetricians and Gynecologists, a leading publisher of literature in this area, is the development of literature to defend lawsuits.

Because the law does not lead science, it should not be hasty to impose liability when scientifically reliable evidence is unavailable. *Havner*, 953 S.W.2d at 728. The same principle must hold true when a defendant seeks to use scientifically unreliable evidence to avoid liability. Accordingly, after examining the entire record, I would hold that appellees' experts' opinion, that the natural forces of labor can cause a brachial plexus avulsion, is unreliable and inadmissible, and the trial court abused its discretion in allowing the admission of this

opinion testimony. *Whirlpool Corp.*, 298 S.W.3d at 637; *Mendez*, 204 S.W.3d at 800. To hold otherwise under the facts of this case, as I mentioned at the beginning of this dissenting opinion, calls into question whether the rules on the admissibility of expert opinions are applied fairly and equitably to both medical malpractice plaintiffs and defendants.

**C. The admission of the natural forces of labor opinion testimony was harmful.**

Because I would exclude the challenged expert testimony, I examine whether the trial court's decision to allow the testimony was harmful. Tex.R.App. P. 44.1(a). Once again, one must look to the whole record to determine whether the error probably caused the rendition of an improper judgment. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex. 1995).

Initially, appellees contend appellant waived consideration of the harm by failing to adequately brief the harm issue. I believe appellant adequately briefed the harm issue. In her initial brief, appellant asserted: "the *Daubert* challenge on this issue should have been sustained and the testimony from the Defendants should not have been allowed. Without the testimony regarding the maternal forces of labor, all of the evidence pointed to the avulsion being caused by Dr. Roush's pulling on the child's head." Then, in her reply brief, appellant expanded on that argument.

It was undisputed that Jordan Robinson suffered an avulsion, the most serious type of brachial plexus injury. It was also undisputed that excessive traction by the delivering physician is the most common cause of brachial plexus injuries. While hotly contested, Dr. Roush denied applying excessive force to Jordan during the delivery. However, her testimony would only be credible if there was a medically plausible explanation for how Jordan suffered an avulsion if the delivering physician did not apply excessive force. Therefore, we conclude the challenged expert testimony was crucial to appellees' defense. Appellees' trial counsel admitted as much when he told the trial court: "Let me suggest, Judge, if you grant either one of these [*Daubert*] motions, then the case is over on liability. There is no fact issue to go to the jury." [15] Having examined the entire record, I would hold that the trial court's decision to admit the challenged expert testimony was harmful.

### CONCLUSION

I would sustain appellant's first issue on appeal, reverse the judgment of the trial court, and remand this case to the trial court for further proceedings consistent with this dissenting opinion.[16]

---

15. Appellees also filed a *Daubert* motion seeking to exclude appellant's expert testimony on causation. That motion is not at issue in this appeal.

16. Because I would sustain appellant's first issue on appeal, I do not address her remaining issues. Tex.R.App. P. 47.1.